**WESTCHESTER RESCO COMPANY, L.P., Plaintiff,**

v.

**NEW ENGLAND REINSURANCE CORPORATION, Defendant.**

No. 86 Civ. 4481 (RWS).

United States District Court, S.D. New York.

Nov. 20, 1986.

Debevoise & Plimpton, New York City, for plaintiff; Robert L. King, of counsel.

Mendes & Mount, New York City, for defendant; Eileen M. Dacey, Peter W. Birkett, of counsel.

SWEET, District Judge.

Westchester Resco Company, L.P. ("Resco") has moved this court for summary judgment in its favor under Rule 56, Fed.R. Civ.P., on the first of its four causes of action against New England Reinsurance Corporation ("New England"). New England has cross-moved for summary judgment on all four causes of action. The motions were fully submitted and argued September 19, 1986. For the reasons set forth below, Resco's motion is granted as to the first cause of action, mooting the final three claims, and New England's cross-motion is, therefore, granted as to those claims.

**Facts**

The facts in this case are an object lesson in how not to make a contract. Although all the parties involved were apparently acting according to the general practice in the insurance industry, the rounds of letters, telegrams, binders and policy terms that were sent in various directions among the two parties and their brokers make it difficult indeed to determine whether or not minds ever met.

Altogether, five entities were involved in the events leading up to the dispute. Westchester Resco Co., L.P. ("Resco"), began to build a solid waste disposal, resource recovery, and electric generation facility in Peekskill, New York in April, 1982, and sought to insure this venture under terms which will be described below in more detail. Resco employed Johnson & Higgins of Massachusetts, Inc. ("J & H") to procure the insurance. J & H turned to the London Agency Inc. ("London Agency") to act as a broker for the deal. J & H and the London Agency sought to buy the necessary insurance from New England Reinsurance Corp. ("New England"). Cameron & Colby Co. ("Cameron") acted as

New England's agents during the negotiations.

Resco sought an insurance policy which would provide umbrella coverage during the course of the facility's construction (which was not to exceed three years) and provide a more limited coverage, called "completed operations coverage," for liability arising out of the construction for a period three years after construction was completed. In pursuit of this coverage, London Agency, on March 30, 1982, sent a page and a half proposal outlining Resco's insurance needs to Cameron. The proposal explained that the insurance that Resco desired should "cover the term of the Job [construction of the facility] plus 3 yrs. Completed Ops." Over the next few days, two telexes were sent from the London Agency to J & H, both reflecting negotiations between the London Agency and Cameron, and both referring to a three year completed operations extension as being part of the deal. The latter of the two says that the London Agency has "bound" $15 million worth of this coverage with New England.

On April 14, 1982, the London Agency sent another document to J & H. This document has the word "Binder" printed at the top, and lists—as briefly as Resco's proposal had—the terms of the coverage. It identifies the "Effective Date" as "4/15/82–4/5/85." It establishes when premiums are due, and how much they will be. In the section titled "Remarks," the Binder says *Policy to include 3–year extension for completed operations* (emphasis in original). William Greene ("Greene"), the Vice-President of the London Agency, has submitted an affidavit in which he says that this Binder was issued only after the terms and the conditions of the coverage were offered to both the purchaser and the seller and accepted by both. Greene also explains that it is customary "in this industry in general and in [the London Agency's] dealings with Cameron & Colby in particular that if any term or condition included in the Binder is not acceptable, such term or condition is objected to immediately." The Binder indicates that

the London Agency sent Cameron a blind carbon copy of it. Cameron did not object to any of the terms.

Printed at the bottom of the Binder is this sentence: "Coverage bound herewith shall be subject to all terms and conditions of the policy to be issued which, when delivered, replaces this binder."

Resco received the formal Policy in June, 1982. The Policy is silent on the question of completed operations coverage. In addition, Condition L of the Policy provides: "Notice to or knowledge possessed by any person shall not effect a waiver or change in any part of this policy ... nor shall the terms of this policy be waived or changed except by endorsement issued to form a part hereof, signed by an authorized representative of the COMPANY."

At the inception of the coverage, Resco's first premium of $66,400 was due, and was paid in a timely manner. On the first anniversary of the effective date of the insurance, April 5, 1983, Resco's second premium of $57,000 became due and was also paid in a timely manner. A year later on April 5, 1984, Resco's third and final payment of $61,600 became due. It too was timely paid.

On May 3, 1984, Endorsement 13 was added to the Policy. It reads:

### ANNIVERSARY INSTALLMENT ENDORSEMENT

In consideration of the 2nd anniversary advance premium of $61,600, for the period April 5, 1984 to April 5, 1985, it is further agreed the expiration date as respects completed operations is extended for two years after the completion date. However, in no event shall the expiration date, including the completed operations extension, extend beyond April 5, 1987.

On December 15, 1984, Resco notified its insurers that construction had been completed.

In April, 1985, J & H and the London Agency communicated with each other discussing the need to have the Endorsement

modified to conform to the Binder. By letter dated May 3, 1985, the London Agency asked Cameron to amend Endorsement 13 to bring it into line with the terms of the Binder. On July 9, 1985, Cameron telexed back to the London Agency that total coverage would not extend beyond five years. On the same day, Endorsement 15 was issued providing:

> In consideration of the premium charged, it is agreed that Endorsement ō13 is amended in part to clarify the extended completed operations coverage period applies [sic] from the 12/15/84 completion of the job, to the 4/5/87 expiration of the policy.

In August and September, 1985, the London Agency and Cameron again exchanged letters, the London Agency taking the position that if Cameron did not intend to provide three-year coverage it should have said so on receipt of the Binder and Cameron taking the position that it never intended the total policy term to exceed five years. Specifically, Cameron wrote: "It was never intended the total policy term including completed operations extension, exceed 5 years" [sic].

On May 5, 1986, a representative of the London Agency met with a representative of Cameron. The Cameron representative displayed, but did not deliver, a cancellation notice that he had prepared that stated that coverage would be cancelled on April 5, 1987. Two days later, on May 7, 1986, the representatives spoke again, and Cameron informed the London Agency that it was mailing a cancellation notice out that day to be effective on June 9, 1986. Resco received the cancellation later that month. It read:

> You are hereby notified that the above policy is hereby cancelled in accordance with the conditions of the policy. Said cancellation to be effective on and after the hour and date mentioned above. [June 9, 1986, 12:01 AM]
> The excess paid premium above the pro-rate premium for the expired term (if not tendered) will be refunded upon demand.

The notice gives no reason for the cancellation. New England tendered $16,492 as the purported *pro rata* adjustment for the cancelled life of the Policy. Resco refused the tender, instead taking the position that the cancellation was invalid and a breach of New England's obligations under the insurance contract.

On June 9, 1986 Resco filed a suit against New England containing four causes of action: 1) seeking declaratory relief that the Policy is in effect until December 15, 1987; 2) seeking damages for New England's alleged breach of contract; 3) seeking damages for New England's alleged breach of an implied covenant of good faith and fair dealing; and 4) seeking damages for wrongful cancellation of insurance.

**Conclusions**

█ Under New York law, the unique nature of insurance binders has justified a special approach to the problem of contract formation:

> Daily, important affairs and rights in our society are made to depend upon [binders]. It is a common and necessary practice in the world of insurance, where speed is often of the essence, for the agent to use this quick and informal device to record the giving of protection pending the execution and delivery of a more conventionally detailed policy of insurance.

*Employers Commercial Union Ins. Co. v. Firemen's Fund Ins. Co.,* 45 N.Y.2d 608, 612–13, 384 N.E.2d 668, 670, 412 N.Y.S.2d 121, 124 (1978). Thus a binder alone is sufficient to establish coverage, but the deal is not completely done until the policy is issued. Indeed, in the species of cases in which an accident occurs after the binder has been issued but before the policy has, courts will infer that the binder is conditioned by the "limitations usual to the contemplated coverage," on the assumption that "many policy clauses are either sterotypes or mandated by public regulation." *Id.* In essence, the Court of Appeals has determined that there are two distinct types of terms in an insurance contract:

the terms unique to the deal, over which the parties bargain and memorialize in a binder; and the terms that are the "usual" or "sterotypical" conditions and limitations, which are not bargained over and which are spelled out fully for the first time in the policy. Therefore, in trying to divine the meaning of the contract with regard to unique features of the coverage, the first place to look is the binder.

 Here, the facts show that the parties agreed to the Binder dated April 14, 1982. In deciding whether parties have agreed to a contract, a court may look to the custom and practice of the industry in which the parties are active. An affidavit submitted by Greene informs the court that the custom in the insurance industry is that if a party does not agree to a term in a binder, the party objects to it immediately, and that this practice was followed in particular between the London Company and Cameron. J & H, the London Agency, and Cameron all had copies of the April 14 Binder and, according to the record, no one objected to any of the terms. Section 69 of the Second Restatement of Contracts provides that if "previous dealings" make it reasonable that one party should notify the other if he does not intend to accept, then silence may operate as acceptance. Restatement (2d) of Contracts § 69(1)(c)(1981). The parties acted as if agreement had been reached; before receiving the Policy, Resco tendered payment in the amount provided by the Binder and New England accepted it. Under New York law, "[a]n offer may be accepted by conduct or acquiescence." *John William Costello Assoc. v. Standard Metals Corp.*, 99 A.D.2d 227, 472 N.Y.S.2d 325, 327 (1st Dept.1984). Thus both sides assented to the terms of the contract as spelled out in the Binder.

One of the terms in the Binder provides explicitly for a three-year completed operations coverage: *"Policy to include 3–year extension for completed operations."* (Emphasis in original). This is the very first item in the "Remarks" section of the Binder, the section which spells out the specific exclusions and additions important enough to record even in a document as cryptic as a binder. It is also the *only* of the seven provisions in the "Remarks" section that is emphasized by underscoring.

Despite the explicit provision for a completed operations extension in the Binder, when the Policy was issued, it was silent as to the term of such extension. Analytically, this problem can be approached in two ways, both of which yield the same result and give proper effect to the intent of the parties and to the goals of New York contract law. Under the first analysis the Binder and the Policy can be read together to form the insurance contract, and because the Policy is silent on the subject of completed operations, the provision in the Binder will control. The general logic of the two-stage mode of contract formation that New York courts have approved for insurance contracts suggests this meshing of documents. If the standardized terms of an unissued policy are to be read into the bargained terms of a binder, it seems appropriate to read the bargained terms of the binder into the standardized terms of the policy.

Under the second view of the problem, the Policy, as the final written instrument, is the formal contract, but the parties mistakenly omitted the provision pertaining to the term of completed operations. It is well established under New York law that a court may reform a contract "to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties." *George Backer Mgmt. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219, 385 N.E.2d 1062, 1066, 413 N.Y.S.2d 135, 139 (1978). The facts establish that the parties as set forth in the unmodified Binder intended the Policy to include a three-year completed operations extension. The Binder is explicit on this subject. As far as the record reveals, the Binder was the parties' last word on the terms of the contract before the Policy was issued. That is, between the issuance of the Binder and the Policy, no negotiation whatsoever took place over any of the terms, and the Policy was merely to formalize what everyone had

agreed on while adding the usual stereotypical terms and limitations.

Moreover, the Binder is not the only evidence that the parties meant to include a three-year completed operations extension. As set out above, virtually every document or telex that exchanged hands leading up to the agreement on the Binder mentions the extension. Indeed, the communications from the beginning of the negotiations to the issuance of the Policy support the contention that the extension was to be a part of the contract, and no evidence from that period even hints otherwise.

Even New England's conduct years after the adoption of the Binder shows that it saw itself committed to a completed operations extension of some length. In May, 1984, after Resco had already tendered its final payment under the contract, New England issued Endorsement 13, providing two years of completed operations coverage, presumably because it believed that the deal that they had originally struck required some kind of completed operations coverage. Parenthetically, the Endorsement recites as consideration for the granting of a two-year completed operations extension that Resco tendered its second anniversary premium. However, timely payment of the premium is already an obligation of Resco's under both the Binder and the Policy, and it is well settled in contract law that performance of a contractual obligation is not valid consideration to amend the contract. Thus, New England was either giving Resco a gift, or, as is established by all the other evidence, it already believed that an extended operations period had been part of the original deal, although not agreeing to the three-year term contained in the Binder.

Finally, that New England had intended that there be completed operations coverage is born out by its agent's correspondence with Resco's agent at an even later stage in the controversy. In a letter dated September 4, 1985, Cameron wrote the London Agency a letter which contained this sentence: "It was never intended the total policy term including completed operations extension, exceed 5 years." This confirms that New England did intend for there to be a completed operations extension of *some* period.

■ Since both parties intended for completed operations coverage to be a part of the contract, its total omission from the Policy is mutual mistake. In such circumstances, this court has the power to reform the contract by adding the omitted term, thereby giving effect to the parties' intent at the time they contracted.[1] In this case, the history of negotiations and the explicit terms of the Binder show with certainty what that intent was: the completed operations period was to be three years long. Accordingly, the contract will be reformed to provide for a three-year completed operations extension.

■ This leaves only the issue of whether the cancellation clause in the Policy applies to the completed operations extension. The language of the Policy shows that it does not. Condition N of the Policy provides:

> This policy may be cancelled by [New England] by mailing to [Resco] at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice and the effective date of cancellation stated

1. At least one authority is of the view that a court can reform a contract for insurance even if there is neither mutual mistake nor fraud, but merely where the insurer issues a policy at odds with the coverage requested without pointing the differences out:

> Where the insurer deliberately issues a policy which differs from the one for which the insured made application, without having told the insured that the one applied for cannot be obtained or without specifying the differences between the requested policy and the issued policy, the insured is entitled to reformation to make the policy conform to the one "bargained" for.

G. Couch, 17 *Cyclopedia of Insurance Law* § 66.21 (1983) (footnote omitted).

in the notice *shall become the end of the policy period.*
(Emphasis added). What this does is enable New England to accelerate the end of the Policy period. If New England does not do so, the Policy explicitly provides that the policy period ends April 5, 1985, exactly three years after the effective date of the coverage. By definition, completed operations coverage begins at the expiration of the policy period. Once the policy period has lapsed, the terms of Condition N do not authorize cancellation. Because New England's notice was delivered well after the contractual end of the policy period, it falls outside the authority of Condition N, and, therefore, is not a valid cancellation.

Although industry authorities such as Appleman's *Insurance Law and Practice* (1979) and Couch's *Cyclopedia of Insurance Law* (1983) do not discuss an industry norm with regard to cancellation of completed operations coverage, an analysis of the market for completed operations coverage and the role of cancellation clauses as incentives for safe behavior on the part of the insureds supports this textual interpretation. By means of a cancellation clause, an insurer can police the underwritten activity to see that things are being done, as agreed, in a safe and prudent manner and thus seek to minimize accidents, and consequent claims. Through the threat of insurance cancellation, an insurer can, for instance, prevent a contractor from substituting substandard building materials for what the plans call for or from employing unsafe construction techniques. *Cf.* Abraham, *Efficiency & Fairness in Insurance Risk Classification,* 71 Va.L.Rev. 403 (1985) (coverage pricing and risk classification can affect insured's behavior).

On the strength of this logic, it is easy to understand why, as Resco has represented, it is extremely difficult, and sometimes impossible, to purchase completed operations insurance from a company that did not underwrite the initial construction. Completed operations coverage insures against damage arising out of the construction once the construction has been completed.

But after the construction has been completed, the risk has—so to speak—already been set in concrete, and only the company that insured and monitored the project during construction knows exactly the extent of that risk.

All of this supports the interpretation of the cancellation clause that has been set out. Only during the construction period can the insurer use a cancellation clause to *affect* the underwritten activity to reduce its risk, so for the insurer, this is the crucial time for it to have the power to cancel. After construction is completed, its need for this stick is drastically reduced. From the point of view of the insured, it is inconceivable that it would agree to a provision that allows cancellation of completed operations insurance after construction has been completed, after the insurer's ability to police the job has been consequently curtailed, and after the premiums have been fully paid, particularly when, for all intensive purposes, it is impossible in the insurance market to buy completed operations coverage from anyone but the company that underwrote the construction itself.

Accordingly, the court holds that the Policy provides for a three-year completed operations extension, and that this extension cannot be cancelled after the expiration of the policy period on April 5, 1985. Because New England did not give notice of cancellation before then, the completed operations coverage remains in effect until three years after the date of completion of construction, December 15, 1987.

Because the court has held that the completed operations coverage has not been cancelled, New England cannot be said to have breached its contract. Therefore, its cross-motion for summary judgment dismissing causes two through four is granted.

IT IS SO ORDERED.