**OLIN CORPORATION, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

**No. 84 CIV 1968 (LBS).**

United States District Court,
S.D. New York.

Aug. 2, 1990.

Haythe & Curley (James J. Harrington, Michael L. Gioia, Russell K. Statman, of counsel), New York City, for plaintiff.

Mudge Rose Guthrie Alexander & Ferdon (Paul R. Koepff, Gabriella S. Tussusov, of counsel), New York City, for defendant Ins. Co. of North America.

Seward & Kissel (Dale C. Christensen, Jr., R. Scott Garley, Pia E. Riverso, of counsel), New York City, for defendant The Hanover Ins. Co.

Hopkins & Sutter (Richard H. Gimer, Kathryn A. Underhill, Laura A. Lane, of counsel), Washington, D.C., Locker, Greenberg & Branin (Theodore M. Greenberg, of counsel), New York City, for Commercial Union Ins. Co. and Falcon Ins. Co.

Gottesman, Wolgel, Smith & Secunda, P.C. (Lawrence L. Flynn, of counsel), New York City, for defendant Great American Ins. Co.

Sheft & Sweeney (Peter I. Sheft, of counsel), New York City, Jackson & Campbell, P.C. (James P. Schaller, M. Elizabeth Medaglia, Richard W. Bryan, of counsel), Washington, D.C., for defendants American Home Assur. Co., Lexington Ins. Co., Nat. Union Fire Ins. Co. of Pittsburgh, Pa.

Rogers & Wells (Joseph H. Spain, Barry W. Rashkover, of counsel), New York City, for defendant Federal Ins. Co.

Bromley, Brown & Walsh (James W. Greene, of counsel), Washington, D.C., Bower & Gardner (Barry G. Saretsky, Allen G. Katz, of counsel), New York City, for defendants American Re–Insurance Co., Continental Cas. Co., Nat. American

Ins. Co., Northbrook Excess and Surplus Ins. Co.

## OPINION

SAND, District Judge.

Plaintiff Olin Corporation ("Olin") seeks in this action, *inter alia*, a declaratory judgment that various defendant insurance companies have a duty to defend and indemnify Olin in connection with certain events involving mercury contamination allegedly caused by Olin's former chlor-alkali plant in Saltville, Virginia. *See* First Amended Complaint, ¶¶ 60–65, 82–85 (Counts IV and VII). We consider now the motions for partial summary judgment brought by Olin's primary and excess insurance carriers on the grounds that Olin breached the notice provisions of the various insurance policies by providing late notice as a matter of law. We grant those motions.

### Background [1]

From 1954 to 1972, Olin and its predecessors operated a chlor-alkali plant in Saltville, Virginia that produced chlorine from salt using a mercury cell process. As part of that process, mercury-contaminated wastes were deposited into muck ponds and later seeped into the immediately adjoining North Fork of the Holston River.

In 1970, the Virginia State Water Control Board ("VSWCB") and the Virginia State Health Department conducted fish and sediment sampling in the Holston River and discovered mercury contaminations in excess of the FDA-approved limit. As a result, Virginia placed a ban on fishing in the North Fork. Olin also received correspondence from environmental groups in 1970 expressing concern over mercury discharges.

In 1972, Olin closed its Saltville plant and donated most of the land, other than the settling ponds, to the State of Virginia and the Town of Saltville. As part of its deed of gift, Olin agreed to demolish the chlorine plant, to deed the settling ponds to the Town of Saltville at a later date, to "remove the soil along the river bank between the river and the building and [to] cover the area completely with fresh soil," and to give the Town of Saltville $600,000 over the next four years for a "Planning, Salvage, Reclamation and Development Project" and the "Town Operating Budget." Olin continued to monitor the mercury contamination in the river on a monthly basis and in 1975 recorded an unexplained increase in mercury levels. In June 1975, the VSWCB required Olin to obtain a permit imposing limitations and requirements on the continuing mercury "discharges" from the muck ponds.

At Olin's request, Hunton & Williams, a Virginia law firm, prepared a 86–page memorandum dated October 6, 1976 analyzing Olin's "potential liability" for "past and continuing 'discharges' of mercury." The memorandum concluded that notwithstanding Olin's conveyance of the plant site to the Town of Saltville, "Olin could probably be held liable under common law nuisance theory, the Refuse Act, and the Virginia SWCL [State Water Control Law] for the mercury pollution in the North Fork of the Holston River and the 'discharges' from the chlor-alkali plant site."

In March 1978, Hunton & Williams provided Olin with a supplemental memorandum "to enable Olin to assess its potential exposure and liability in the *threatened proceedings* by the State Water Control Board and in any other proceedings arising out of the [Saltville] situation." (emphasis supplied). That analysis concluded:

Olin may be liable under several theories for the mercury and TDS discharges from the muck ponds. If the muck ponds are significantly contributing to the mercury or TDS pollution in the river, Olin is probably liable for a public and private nuisance under federal common law (depending on whether the pollutant discharges affect Tennessee waters).

---

1. Most of the factual background is taken from the October 1976 memorandum prepared by Olin's attorneys, *see* Affidavit of Paul R. Koepff dated January 9, 1990, Ex. 1, and the EPA Remedial Action Master Plan, *see id.,* Ex. 2. The parties have provided essentially identical narratives, and the following background facts are not in dispute.

The fact that the FDA mercury standard for fish and the TDS water quality standard are being violated is probably sufficient interference with the use and enjoyment of the river to constitute a nuisance. And a court may apply a *per se* nuisance theory in which case the violations of the standards, without regard to actual effects on public uses, would be sufficient evidence to prove a nuisance (assuming that the muck ponds contributed to the violations)....

Olin appears to be liable under the Federal Water Pollution Control Act (FWPCA), the Refuse Act and the State Water Control Law (SWCL) for discharging from a point source (i.e., the outfalls) without a permit.

. . . . .

Olin's potential liability for mercury discharges into the Holston River under the nuisance theory may have increased since 1976 as a result of (a) increased quantities of mercury which have entered the river and (b) more stringent regulatory standards which could make Olin's discharges a nuisance *per se.*

The supplemental memorandum noted that "[t]here are several recent statutory developments which, while not yet effective, will increase Olin's potential liability in the future," pointing to the amendments to the FWPCA which "provide for the recovery of costs up to $50 million for cleanup and mitigation of discharges of hazardous substances." The memorandum also stated: "Olin will likely be subject to requirements under the Resource Conservation and Recovery Act (RCRA) once EPA promulgates regulations implementing the Act. The muck ponds probably constitute hazardous waste facilities which, under EPA's draft regulations for ponds and lagoons, must meet stringent standards." As to the size of Olin's potential liability, the memorandum stated that the EPA draft standards require that "liners be used for hazardous waste ponds which prevent seepage of wastes from the facility" and that under a nuisance theory, "a court may be willing to impose such drastic measures as ordering Olin to seal the muck ponds to prevent seepage or, alternatively, allowing the state to carry out such measures and requiring Olin to reimburse the costs."

Starting in 1978, an interagency task force, comprised of the VSWCB, the Virginia State Attorney General's Office, the Virginia and Tennessee Departments of Public Health, the Tennessee Valley Authority, and the United States Environmental Protection Agency ("EPA"), conducted several detailed studies to assess the existence and extent of mercury contamination of the North Fork. Initially, Olin was not cooperative, and "the State threatened legal action for damages and cleanup of the site." *See* Affidavit of Paul R. Koepff dated January 9, 1990 ("Koepff Aff."), Ex. 5 at 31. Then, starting in 1979, Olin, with the concurrence of the Task Force, instituted a multi-phase mercury abatement and monitoring program. In October 1979, Olin rip-rapped the bank at the old plant site to stop the continuing erosion; that project cost $400,000. *See id.* at 32. During the summer of 1982, Olin rip-rapped a portion of the river bank downstream, adjacent to muck pond 5; that project cost $240,000.

The undisputed facts indicate that Olin was aware of the potential high costs of remediation. In late 1980, Olin estimated that it would cost $25 to $30 million to remove the mercury from pond 5 and dispose of it in a secure landfill. *See* Koepff Aff., Ex. 5 at 15. In an October 1982 memorandum, the Task Force discussed several abatement alternatives, including "the total removal of all contaminated soils and muck with proper burial at an approved disposal site" at a cost of over $210 million. *See* Koepff Aff., Ex. 5 at 34. Although that alternative was rejected, partly because of its high cost, Olin was informed of the potential magnitude of the clean-up problem.

During 1982, Olin and the Task Force drafted and negotiated a consent decree setting forth Olin's cleanup and remediation obligations. *See* Affidavit of E. McIntosh Cover dated March 15, 1990 ("Cover Aff."), Ex. 38. Olin agreed to (1) construct a diversion ditch to reduce the surface wa-

ter runoff from the muck pond, (2) dredge portions of the river bed to reduce mercury sediments, and (3) monitor the mercury levels in fish and waterways for five years. *Id.* That order recited that Olin had already spent approximately $1.8 million and had budgeted an additional $3.2 million to complete the prescribed work. The order, moreover, explicitly did not release Olin from future liability:

> [T]he Board reserves the right to initiate appropriate judicial action to abate any substantial and imminent endangerment to the public health or the environment that exists, arises, or may come to its attention because of the presence of mercury related to Olin's former operations at Saltville.

The EPA had been involved with the Task Force negotiations that began in 1978 and had concurred with the 1982 Consent Decree. However, in 1982, the EPA began to take independent action against Olin. In the Spring of 1982, Olin "learned informally" that Saltville would be included on the CERCLA list of most hazardous sites and in October 1982, "learned more definitely that Saltville would be listed." *See* Koepff Aff., Ex. 12. By letter dated January 17, 1984, the EPA notified Olin that "[t]he old Olin site in Saltville, Virginia has been included by the EPA on the National Priorities List of Superfund sites" and enclosed a draft Remedial Action Master Plan (RAMP) for Olin's comments. *See id.*, Ex. 13. The EPA issued the final RAMP in July 1984, which identified a range of possible long-term remedial measures from no action to any combination of the following remedial alternatives: surface capping, groundwater barriers, chemical stabilization, groundwater collection and treatment and/or surface water diversion and collection. *See id.*, Ex. 2. On June 30, 1987, the EPA issued its Record of Decision which recommended "upgradient storm water control by construction of ditches, berms and swales and detoxification of contaminated material in an onsite pond." *See* Koepff Aff., Ex. 15 at 100.

Olin also annually informed its outside auditors of the Saltville mercury problem. In a December 1980 memorandum to its auditors, Olin classified the Saltville problem as "threatened litigation or administrative proceedings involving $1,000,000 or more." *See* Reply Affidavit of Paul R. Koepff dated April 30, 1990 ("Koepff Reply Aff."), Ex. 37. Olin again told its outside auditors in December 1981 that the Saltville claims constituted "threatened litigation." *See* Koepff Reply Aff., Ex. 38. In its January 1982 report, Olin told its auditors: "At one time, [the Saltville] matter was close to litigation. Current expectations are that the matter will ultimately be settled through administrative negotiations [with the Task Force]." *See* Koepff Reply Aff., Ex. 39.

### Notice to Olin's Insurers

On March 31, 1983, Olin wrote to its insurance broker, Johnson & Higgins, "to advise that Olin is hereby making a claim to its primary and excess insurers for indemnification in respect of property damage arising out of the escape of mercury from its mercury cell chlor-alkali plant ... in Saltville, Virginia." *See* Koepff Aff., Ex. 9. That letter explained that "[f]or a substantial period of time, Olin has been negotiating with various federal and state agencies on how to address the problem." Olin stated that in response to threatened litigation by the Task Force, it undertook a variety of remedial projects that cost $4,580,000. Olin's letter was forwarded by the insurance broker to Olin's primary and excess insurers by cover letter dated April 12, 1983. *See id.* Olin filed this action for declaratory judgment on July 1, 1983.

### Choice of Law

█ Federal courts sitting in diversity jurisdiction must apply the choice of law rules of the forum state. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York law requires courts to apply the law of the jurisdiction "which has the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954); *Fleet Messenger Service, Inc. v. Life Ins. Co. of N. America*, 315 F.2d 593, 596 (2d Cir.1963) (applying *Auten*

to an insurance contract). In cases involving insurance contracts, New York courts have looked principally to the following factors: the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business. *See Golotrade Shipping & Chartering, Inc. v. Travelers Indem. Co.*, 706 F.Supp. 214, 218 (S.D.N.Y.1989) (principal place of business of insured; location of insurance broker; where policy delivered; where premiums paid); *Ethicon, Inc. v. Aetna Casualty and Surety Co.*, 688 F.Supp. 119, 123–24 (S.D.N.Y.1988) ("state which the parties understood would be the principal location of the risk"; where policies issued; principal place of business and state of incorporation of the insured); *McGinniss v. Employers Reinsurance Corp.*, 648 F.Supp. 1263, 1267 (S.D.N.Y.1986) (residence of insured; place where policy issued); *American Re–Insurance Co. v. SGB Universal Builders Supply, Inc.*, 141 Misc.2d 375, 532 N.Y.S.2d 712, 715 (N.Y.Sup.Ct.1988) (where policy issued, delivered and paid for; location of agent).

■ Here, the risks covered by the insurance policies were not confined to any one principal location. Over the entire period from 1955 to 1974, the negotiations, underwriting, issuance, execution and delivery of the various policies took place in New York. *See* Koepff Aff., ¶ 36 & Ex. 16; Affidavit of Bernard A. Buge, Jr. dated April 27, 1990 ("Buge Aff."), ¶ 10; Hanover's Reply Memorandum in Support of its Motion for Partial Summary Judgment at 5–6. Prior to 1970, Olin was headquartered in New York City; after 1970, Olin maintained offices in New York City. Olin's insurance broker, Johnson & Higgins, is located in New York. Olin only argues that since it moved its principal place of business to Connecticut in 1970, Connecticut has more significant contacts since any recovery will flow to Olin in Connecticut. However, other courts have applied New York law to disputes involving insurance contracts even though the insured's principal place of business was located outside of New York. *See International School Services, Inc. v. Northwestern Nat'l Ins. Co.*, 710 F.Supp. 86, 88–89 (S.D.N.Y.1989) (insured's principal place of business was New Jersey; contract negotiated and entered into in New York); *Schering Corp. v. Home Ins. Co.*, 544 F.Supp. 613, 618 (E.D.N.Y.1982), *rev'd on other grounds*, 712 F.2d 4 (2d Cir.1983) (policies issued and signed in New York; insurer's principal place of business is New York); *Parlato v. Interport Trucking Co.*, 540 F.Supp. 1051, 1053 (E.D.N.Y.1982) (insured was New Jersey corporation; broker resided in New York; insured maintained office in New York). We find that for each of the insurance policies involved in this dispute, the significant aspects of contract formation and performance occurred in New York. New York has the most significant contacts with the dispute, and we will apply New York law.

Moreover, we note that Olin did not raise this choice of law issue in connection with the prior motion practice in this case. Olin previously relied on New York law in its papers submitted to this Court, and this Court's prior decision was based on New York law. *See Olin Corp. v. Insurance Co. of North America*, 603 F.Supp. 445, 448 (S.D.N.Y.1985).

*The Notice Provisions of the Various Insurance Policies*

1. Insurance Company of North America

The Insurance Company of North America ("INA") provided Olin's primary layer of comprehensive general liability coverage for policy periods from June 1, 1955 to January 1, 1974. INA policy XCP 1049 covers the policy period June 1, 1955 to January 1, 1960 and provides:

H. Notice of Occurrence or Accident

Upon the happening of an occurrence or an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time,

place and circumstances of the occurrence or accident, the name and address of the injured and any available witnesses.

I. Notice of Claim or Suit

If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by the insured or the insured's representatives.

*See* Cover Aff., Ex. 42; Koepff Aff., Ex. 17. INA policy XCP 1049 limits INA's liability to $300,000 and provides for a $100,000 deductible amount. INA policy XCP 3191 covers the period January 1, 1960 to January 1, 1969[2] and contains the identical notice provisions, limitation of liability, and deductible amount as INA policy XCP 1049 (the notice provisions are relabeled as "G" and "H"). *See* Cover Aff., Ex. 45; Koepff Aff., Ex. 18. By endorsement effective June 8, 1965, the first sentence of Condition G—Notice of Occurrence or Accident—was amended to read:

> When an occurrence or accident happens, written notice shall be given by or on behalf of the Insured to the Company or any of its authorized agents as soon as practicable after said occurrence or accident becomes known to the [Insurance and] Loss Prevention Department of the Named Insured.

*See* Cover Aff., Ex. 47.

Olin argues that the above-quoted notice provisions in both policies were revised by an "Endorsement 1" to each policy. However, provision H of each "Endorsement 1" explicitly limits its application to specified divisions and corporations which were not connected to the Saltville plant. *See* Cover Aff., Exs. 42 & 45.

■■■ INA policy SRL 2217 covers the policy period January 1, 1969[3] to January 1, 1974. The parties agree that the text of policy SRL 2217 in effect for policy years January 1, 1969 to January 1, 1973 does not contain an express provision obligating Olin to give INA prompt written notice. However, INA argues that this Court should reform that insurance contract to include such an obligation. We agree that the uncontroverted evidence indicates that the omission of an express notice requirement was most probably an inadvertent error in drafting. We note that policy SRL 2217 did incorporate the following provision which had appeared as an endorsement to policy XCP 3191:

> 4. Insured's Duties in the Event of Occurrence, Claim or Suit
>
> (a) It is agreed that knowledge of an occurrence or suit by the agents, servants or employees of the insured shall not in itself constitute knowledge to the insured unless the Insurance and Loss Prevention Department of the Insured's Corporation shall have received such notice from its agent, servant or employee.
>
> (b) Unintentional errors or omissions shall not prejudice this insurance.
>
> (c) The Insured shall cooperate with INA and upon INA's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of personal injury or property damage with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief as shall be imperative at the time of the accident.

*See* Cover Aff., Ex. 48; Buge Aff., Ex. B. That provision obviously assumes that Olin

---

2. The parties dispute the date on which coverage under policy XCP 3191 is terminated and coverage commences under policy SRL 2217. INA argues that although policy XCP 3191 was originally renewed through January 1, 1969, Olin and INA later agreed that the premiums paid for coverage under that policy for January 1, 1968 to January 1, 1969 would be treated as premiums paid under policy SRL 2217. *See* Cover Aff., Ex. 49. We need not resolve this dispute because we conclude that Olin provided late notice under both policies.

3. *See supra* n. 2.

must give INA prompt notice. Furthermore, other drafts of policy SRL 2217 did contain notice of occurrence and notice of claim provisions substantially similar to the notice provisions in the pre–1969 insurance policies. *See* Buge Aff., Ex. A; Cover Aff., Exs. 52 (policy ALB 47248) & 54. Where parties make a mutual mistake and omit a term to an insurance contract, a court can reform the contract by adding the omitted term. *See Westchester Resco Co., L.P. v. New England Reinsurance Corp.,* 648 F.Supp. 842, 847 (S.D.N.Y.1986), *aff'd* 818 F.2d 2 (2d Cir.1987). We find that the insurance policies in effect for prior policy years, the other drafts of policy SRL 2217 and the implicit obligations contained in other provisions all indicate that the parties intended to include substantially similar notice of occurrence and notice of claim provisions in policy SRL 2217.

■ Alternatively, even if we did not so reform the policy to include a notice provision, where an insurance contract is silent, New York law will imply an obligation to notify the insurer within a reasonable period of time. *See Ell Dee Clothing Co. v. Marsh,* 247 N.Y. 392, 396, 160 N.E. 651 (1928) ("Some conditions may be so well understood as universally entering into insurance contracts, such as the necessity of notice and proofs of loss given to the insurer within a reasonable time, that the courts will imply them even though the binder [of insurance] be silent."); *see also Allstate Ins. Co. v. Kashkin,* 130 A.D.2d 744, 516 N.Y.S.2d 43 (N.Y.App.Div.1987) ("An insured must give notice to his or her insurer within the time limit provided in the insurance policy or within a reasonable time under all the circumstances.") (citations omitted); *Guadagno v. Colonial Cooperative Ins. Co.,* 101 A.D.2d 947, 475 N.Y.S.2d 926, 928 (N.Y.App.Div.1984); N.Y.Ins.Law § 3420 (McKinney's 1985).

The parties also disagree whether the provisions of policy SRL 2217 in effect for policy year January 1, 1973 to January 1, 1974 include express notice of occurrence and notice of claim provisions that are substantially similar to the notice provisions in the pre–1969 INA policies. We need not resolve this dispute because even if such terms were omitted from the policy, we would again reform the policy to include such provisions, or in the alternative, imply an obligation to notify the insurer within a reasonable period of time.

### 2. Hanover Insurance Company

The Hanover Insurance Company ("Hanover") provided Olin's primary layer of comprehensive general liability coverage for policy periods from January 1, 1954 to June 1, 1955. Policy CGL 22495 covers the 1954 policy period, and policy CGL 24206 covers the 1955 policy period. Both Hanover policies contain the following provisions:

8. Notice of [Occurrence]. When an [occurrence] occurs written notice shall be given on or behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place, and circumstances of the [occurrence], the names and addresses of the injured and available witnesses.

9. Notice of Claim or Suit. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

*See* Affidavit of Dale C. Christensen, Jr. dated November 30, 1989, Exs. E & F.

### 3. Excess Insurance Carriers

To supplement its primary comprehensive general liability insurance, Olin purchased a number of excess insurance policies, in layers, covering successively higher levels of liability. These excess insurance policies cover Olin only upon the exhaustion of the coverage limits of the respective underlying policies. Also, several insurance companies often agreed to split a range of coverage. For example, American Re–Insurance Company policy M–8151–01 covers Olin for a $1.5 million share of any loss up to $5 million in excess of $10.3 million. *See* Affidavit of Michael L. Gioia dated April 16, 1990.

The parties do not dispute the terms of the notice provisions in the insurance policies issued by the excess carriers. We have examined those policies and discern no material difference between those notice provisions and the notice provisions in the INA and Hanover policies quoted above. For example, various Commercial Union Insurance Company and Falcon Insurance Company policies incorporated the terms of underlying excess insurance policies issued by Lloyd's which state:

> D. Notice of Occurrence
>
> Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event the Assured shall be held liable, is likely to involve this Policy, notice shall be sent to [insurer's agent] as soon as practicable, provided, however, that failure to notify the above firm of any occurrence which at the time of its happening, did not appear to involve this policy, but which at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
>
> E. Assistance and Cooperation
>
> Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim or suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding.

*See* Affidavit of Laura A. Lane dated April 30, 1990, Ex. 1. Other policies issued by Federal provide:

> The Insured shall immediately advise the Company of any accident or disaster which will probably result in liability under this Certificate.

*See* Affidavit of Penny McGuire dated November 15, 1989, Exs. A & B; *see also* Memorandum of Law of Olin Corporation in Opposition to the Excess Insurers' Motions for Partial Summary Judgment on Late Notice Grounds at 10–11 (classifying excess insurance policy notice provisions into two basic types as above).

Furthermore, as noted above in our discussion of INA's policies, New York law requires an insured to notify his or her insurer within a reasonable time period.

### Knowledge of Olin's Insurance Department With Respect to Saltville

Under most of Olin's insurance policies, it is important to determine when Olin's Insurance Department first knew about any occurrence or accident with respect to the Saltville plant or when the Saltville-related claims were first asserted against Olin. Olin's Insurance Department was involved in the decision in 1972 to close down the Saltville plant and at that time considered Olin's liability exposure to subsequent owners of the property. *See* Koepff Aff., Ex. 22. A December 1972 memorandum, copied to Mr. Delaney, the head of Olin's Insurance Department, acknowledged that seepage from the mercury ponds exceeded Federal and State standards. *See* Koepff Aff., Ex. 27 at 3. Mr. Delaney also recalls reading a 1979 article in the *Hartford Advocate* about mercury contamination at Saltville and discussing that article with someone. *See id.*, Ex. 31.

In April 1979, Mr. Delaney discussed with Olin's insurance broker whether Olin should notify its insurance carriers of the Saltville matter. According to the handwritten notes of the insurance broker, it advised Olin that "all claims be submitted to ins co—let them decide whether exclusion applies to claim submitted. In event disclaimed we will review with our counsel to see if we agree with ins co position." *See id.*, Ex. 32.

As part of Olin's attempts in 1982 to obtain environmental impairment liability insurance, the potential underwriters required Olin to obtain a report summarizing the risks of environmental liability from

Environmental Risk Assessment Service (USA), Ltd. That report, which Olin's Insurance Department reviewed, recommended that any EIL coverage afforded Olin exclude any claims arising out of the Saltville mercury contamination. *See id.,* Ex. 33.

### Discussion

■ "Under New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 271 (2d Cir.1987) (citations omitted). Late notice is a complete defense whether or not the insurance company was prejudiced by the delay. *Utica Mutual Ins. v. Fireman's Fund Ins. Cos.,* 748 F.2d 118, 121 (2d Cir.1984); *Ogden Corp. v. Travelers Indemnity Co.,* 739 F.Supp. 796 (S.D.N.Y.1989). Compliance with notice-of-occurrence requirements promotes important policy goals:

> Notice-of-occurrence provisions ... enable insurers to make a timely investigation of relevant events and exercise early control over a claim. Early control may lead to settlement before litigation and enable insurers to take steps to eliminate the risk of similar occurrences in the future.

*Commercial Union,* 822 F.2d at 271 (citations omitted); *see also Utica Mutual,* 748 F.2d at 121 ("Prompt notice permits the insurer to investigate the facts on which the claim is predicated and to adjust its books in order to maintain a proper reserve fund in light of the insured's claim.")

There are two questions that courts must answer in evaluating late notice defenses. First, a court must decide when the obligation to give notice accrued. Courts have consistently held that the obligation to provide notice accrues when "the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Commercial Ins.,* 822 F.2d at 272 (citations omitted). New York law applies an objective test, asking what the insured's officers

"reasonably could or should have concluded." *Utica Mutual,* 748 F.2d at 122.

■ Second, a court must then decide whether the insured did in fact provide timely notice. Whether the insurance policy provided for "immediate notice" or notice "as soon as practicable," courts have uniformly required notice within a reasonable time under all the circumstances. *See Utica Mutual,* 748 F.2d at 121; *New York v. Amro Realty Corp.,* 697 F.Supp. 99, 104 (N.D.N.Y.1988); *Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 416 N.Y.S.2d 559, 563, 389 N.E.2d 1080 (1979); *Security Mutual Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 906, 293 N.E.2d 76, 79 (1972). While the reasonableness of delay may be an issue for trial, in the absence of an excuse or mitigating factors, courts have addressed that question as a legal matter. *Amro Realty,* 697 F.Supp. at 104; *Jenkins v. Burgos,* 99 A.D.2d 217, 472 N.Y.S.2d 373, 375–76 (N.Y.App.Div.1984); *Columbus Trust Co. v. Hanover Ins. Co.,* 50 A.D.2d 798, 375 N.Y.S.2d 628, 629 (N.Y. App.Div.1975). Even short periods of delay have been found unreasonable as a matter of law. *See Commercial Union,* 822 F.2d at 272 (eighteen months); *Utica Mutual,* 748 F.2d at 121 (six months); *Ogden,* 1989 U.S. Dist LEXIS 11211 (2½ years); *Howard Fuel v. Lloyd's Underwriters,* 588 F.Supp. 1103, 1105 (S.D.N.Y. 1984) (two years); *Power Authority v. Westinghouse Electric Corp.,* 117 A.D.2d 336, 502 N.Y.S.2d 420, 423 (N.Y.App.Div. 1986) (53 days); *Government Employers Ins. Co. v. Elman,* 40 A.D.2d 994, 338 N.Y.S.2d 666 (N.Y.App.Div.1972) (29 days); *Peerless Ins. Co. v. Nationwide Ins. Co.,* 12 A.D.2d 602, 208 N.Y.S.2d 469 (N.Y.App. Div.1960) (four to five months); *Deso v. London & Lancashire Indemn. Co.,* 3 N.Y.2d 127, 164 N.Y.S.2d 689, 692, 143 N.E.2d 889, 891 (1957) (51 days).

■ Olin argues that the explicit terms of the insurance contracts with INA require it to provide notice "[u]pon the happening of an occurrence or accident that appears reasonably likely to involve liability on the part of [INA]." As we noted

above, that language did not apply to the Saltville insurance coverage. However, even if that language did cover the Saltville mercury pollution matter, we do not believe that it imposes a materially different obligation on the insured than the *Commercial Union* standard quoted above.

■ Olin's obligation to notify its excess insurers is slightly different from its obligations to notify its primary carriers:

> In primary liability insurances the insurer uniformly undertakes to investigate and defend any claim covered by the policy. Consequently such policies regularly require that the assured give to the company immediate notice of any accident or claim involving the insurance. However, in excess liability insurances (as well as in most liability insurances written over a substantial deductible) the excess insurer does not undertake to defend the assured. Consequently, the excess insurer is not interested in every accident, but only in those that may be serious enough to involve it. Excess policies, therefore, usually require an assured to give notice of claims "that appear likely to involve the excess."

*Greyhound Corp. v. Excess Ins. Co.,* 233 F.2d 630, 634 (5th Cir.1956) (quoting 21 Ins. Counsel J. 131). Therefore, Olin's duty to notify each excess insurer accrued when the circumstances known to Olin would have suggested a reasonable possibility of a claim that would trigger that excess insurer's coverage. *See Harbor Ins. Co. v. Trammell Crow Co.,* 854 F.2d 94, 98–99 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989).

■ We conclude that Olin knew or should have known from numerous events that the discharge of mercury from the Saltville plant into the North Fork of the Holston River could cause and evidently did cause extensive property damage. Olin learned of the mercury problem in the early 1970's. Both the 1976 Hunton & Williams memorandum and the 1978 supplemental memorandum indicate Olin's potential liability for the Saltville site cleanup and the high cost of such measures. Olin started working with the Task Force in

1978 and incurred substantial costs in 1979 to control erosion at the Saltville site and monitor the problem. Olin's memoranda to its outside auditors in 1980, 1981 and 1982 also indicate Olin's awareness of its potential liability. In early 1982, Olin began to negotiate the terms of the consent decree which required Olin to spend $3.2 million in addition to the $1.8 million of expenses already incurred. Moreover, the terms of the consent decree make it clear that Olin might still be liable for additional abatement measures. Olin's insurer's were entitled to participate in the negotiations with the interagency task force and the selection of abatement measures. Therefore, by early 1982 at the latest, Olin had information which would suggest to a reasonable person the possibility of a claim or which appeared reasonably likely to involve liability on the part of its insurers. Moreover, Olin should have concluded that those potential claims were of sufficient magnitude to involve both their primary and their excess insurance carriers.

Olin argues that this suit involves five separate "claims," the Virginia State Claim, the Federal CERCLA Claim, the first diversion ditch failure claim, the second diversion ditch failure claim, and the Federal Superfund Amendments and Reauthorization Act of 1986 Claim. Olin argues that its obligation to provide notice was triggered on separate dates for each separate claim. *See* Post–Argument letter of James J. Harrington dated May 8, 1990. However, Olin's policies required Olin to notify its insurance carriers of both "claims" and "occurrences." Those insurance policies define an "occurrence" to include a series of occurrences arising out of a single event. *See e.g.,* Cover Aff., Ex. 42 at 6. In many cases involving environmental contamination, it is often impossible to point to one precise event as the cause of the problem. Olin here operated a chlor-alkali plant at Saltville from the 1950's to 1972. Over time, mercury discharges from the operations seeped into the North Fork of the Holston River, and Olin's potential liability stems from the large accumulation of mercury wastes on the Saltville property which has and likely will continue to pollute

the nearby river. It is this type of continuous sequence of events that courts must treat as a single occurrence in evaluating late notice claims. Other courts have rejected arguments by insureds similar to those here advanced by Olin that their obligation to provide notice did not arise until various government agencies formally asserted claims. *See Ogden,* 1989 U.S. Dist. LEXIS 11211; *Amro Realty,* 697 F.Supp. at 104–105. Whether or not Olin can segregate the Saltville problem into five separate claims, those claims all arose from one continuous "occurrence."

Despite the foregoing sequence of events, Olin failed to notify its primary and excess insurance carriers of any mercury related occurrence or claim prior to April 1983. We find that notice to be untimely as a matter of law. At a minimum, Olin's obligation to notify its insurance carriers arose in early 1982. As the cases cited above indicate, a one-year delay in notice constitutes a violation of the terms of the insurance policies whether or not the insurers can demonstrate any prejudice. Since Olin does not offer any excuse for its delay, we find that Olin failed to provide timely notice as a matter of law.

Finally, as to Hanover only, Olin argues that it provided timely notice because it originally did not know that the 1954 and 1955 Hanover insurance policies existed. However, Olin admits that it discovered the 1955 Hanover policy "[s]hortly before November 4, 1981." *See* Memorandum of Law of Olin Corporation in Opposition to the Motion for Partial Summary Judgment of Hanover Insurance Company at 9. Olin also asserts that it first learned of the 1954 Hanover policy on February 28, 1984 when its paralegal discovered it while searching through boxes in a documents archive. *Id.* at 9, n. 1. We need not resolve whether Olin made reasonably diligent efforts to ascertain the existence of the Hanover coverage. The undisputed facts indicate that Olin knew about the 1955 Hanover policy in 1981, but did not provide notice to Hanover of the Saltville occurrence until July 1, 1983, when it filed suit, or May 2, 1984, when Olin formally notified Hanover.

That delay is unreasonable as a matter of law.

### Conclusion

Concluding that Olin provided late notice of the Saltville mercury occurrence as a matter of law, we grant the defendants' motions for partial summary judgment. The Court will hold a pre-trial conference on September 18, 1990 at 9:30 to discuss the future progress of this litigation.

SO ORDERED.