**R.D. MANAGEMENT CORP.,**
**Plaintiff–Appellant,**

v.

**ACE FIRE UNDERWRITERS**
**INSURANCE COMPANY,**
**Defendant–Appellee.**

**Docket No. 00–7911.**

United States Court of Appeals,
Second Circuit.

March 27, 2001.

Malcolm S. Taub; Steven Nudelman, Pamela Budin, of counsel, Martin & Taub, New York, NY, for appellant.

Paul R. Koepff, O'Melveny & Myers, LLP, New York, NY, for appellee.

Present WINTER, STRAUB and POOLER, Circuit Judges.

SUMMARY ORDER

AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the District Court is hereby AFFIRMED.

Plaintiff–Appellant R.D. Management Corp. ("RD") appeals from a judgment following a bench trial in the United States District Court for the Southern District of New York (Richard Owen, *Judge*), (1) dismissing RD's complaint in its entirety, (2) declaring that Defendant–Appellee ACE Fire Underwriters Insurance Co. ("ACE") had the right under an insurance policy to review updated loss information and seek additional premiums, and (3) awarding ACE $405,119, plus $7,171 in prejudgment interest.

This is a dispute regarding the terms of an insurance policy. RD, a commercial real estate developer, had sought general liability insurance coverage for many of its properties. Thus, RD retained C.S.I.R. Enterprises ("CSIR") as its retail broker to obtain a three-year, pre-paid commercial general liability policy. CSIR in turn retained Dave Grafstein of Bryson Associates, a wholesale insurance broker, to negotiate the policy with an insurance company. Grafstein eventually negotiated a policy from ACE (then CIGNA Fire Underwriters Insurance Company ("CIGNA")[1]) providing three years of commercial general liability insurance for 184 RD properties in 35 states, at a pre-paid three-year premium of $1,053,642.

On July 24, 1998, an insurance binder was issued in advance of the finalization and delivery of the policy. The binder contained a term allowing ACE to review updated underwriting information including loss and exposure information and to increase the premium based on loss ratios on the anniversary dates of the policy. This clause did not specify a maximum loss ratio beyond which ACE would have the right to increase premiums, but instead vested ACE with discretion to determine that percentage, providing: "[ACE] can increase rates based on loss ratios. Final wording to be determined by [ACE]." Approximately three weeks later, on August 17, 1998, the policy was issued. The policy did not contain the premium increase language. It did, however, contain a term allowing ACE to cancel the policy for failure to pay premiums, and provided that in the event of such cancellation, ACE would provide a pro rata refund of premiums paid.

On January 22, 1999, ACE sent a proposed endorsement to Grafstein for RD's signature. The endorsement provided that if RD's yearly loss ratios exceeded 45%, ACE would have the right to increase the policy premium on the policy's anniversary dates. Grafstein forwarded the proposed endorsement to CSIR, but RD did not sign or return the endorsement. On February 23, 1999, ACE sent Grafstein a letter indicating that ACE had the right to increase the policy premium based on loss ratios, but that ACE would not exercise that right on the policy's first anniversary because RD's loss ratio of 46.4% only slightly exceeded the ceiling ratio of 45%. RD did not object to the letter.

In February 2000, ACE reviewed RD's loss history for the preceding year and calculated it to be approximately 110%. Thus, on February 8, 2000, ACE notified Grafstein that RD owed $405,119 as an additional premium payment. On March 3, 2000, CSIR sent ACE a letter objecting to ACE's right to review loss history and to increase the premium. In a March 14, 2000 letter, Grafstein told CSIR that its March 3 letter did not "accurately reflect[ ] the negotiations between CSIR,

1. The policy was originally underwritten by CIGNA. ACE purchased CIGNA's property casualty business in July 1999. The insurer will be referred to as "ACE" throughout this summary order despite the fact that it was still CIGNA when many of the events at issue occurred.

Bryson and [ACE] prior to binding" because, as reflected in the binder, ACE agreed to a three-year pre-paid policy on the condition that ACE would have the right to raise the premiums based on loss ratios.

After RD failed to pay the additional premium, ACE sent RD a notice of cancellation for failure to pay premium. RD thus filed this action seeking a judgment declaring that it is covered under the policy through April 2, 2001, and that it is not required to pay any additional premium. ACE asserted a counterclaim for breach of contract and sought reformation and a declaratory judgment. After a three-day bench trial, the District Court found that ACE's right to increase the policy's premium was intended to be part of the insurance agreement. Accordingly, the court dismissed RD's complaint with prejudice, declared that ACE had the right to raise the premium, and ordered RD to pay ACE the additional premium plus interest. This timely appeal followed.

> In reviewing a district court's decision in a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo.* Mixed questions of law and fact are likewise reviewed *de novo.* Under the clearly erroneous standard, there is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence. We will not upset a factual finding unless we are left with the definite and firm conviction that a mistake has been committed.

*White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir.2001) (internal citations and quotation marks omitted).

The District Court made several findings of fact crucial to its ultimate conclusion that the parties intended the premium increase term to be part of the insurance contract. Among these were (1) that Graf-stein and Bryson Associates were agents of RD and not of ACE; (2) that ACE's delay in sending the endorsement regarding its right to increase the premium was explained by the fact that the right was not pertinent until the anniversary date and the fact that ACE was more concerned about RD's failure to timely pay the premiums; (3) that CSIR was aware that ACE believed it had the right to increase the premium, yet did nothing; and (4) that communications allegedly made by CSIR to Grafstein objecting to the premium increase term did not in fact occur. Lacking a "definite and firm conviction that a mistake has been committed," *id.,* we decline to upset these factual findings. *See Mathie v. Fries,* 121 F.3d 808, 812 (2d Cir.1997) ("[A] reviewing court owe[s] particularly strong deference where the district court premises its findings on credibility determinations." (internal quotation marks omitted)); *see also Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("[If] a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

RD nonetheless asserts that, as a matter of law, the terms of its insurance coverage must be contained in the policy and cannot come from the binder. We disagree. In *Westchester Resco Co. v. New England Reinsurance Corp.,* 648 F.Supp. 842, 845– 47 (S.D.N.Y.1986), *aff'd,* 818 F.2d 2 (2d Cir.1987) (per curiam), the district court concluded that a term included in a binder but omitted from a subsequent policy was part of the insurance contract. "[T]he history of negotiations and the explicit terms of the Binder" showed "with certainty"

that the intent was for the term to be part of the coverage. *Id.* at 847. According to the district court, "both sides assented to the terms of the contract as spelled out in the Binder." *Id.* at 846. The omission of the term from the policy was not fatal to the term, either because the binder and the policy could be read together to form the contract or, alternatively, because the omission was due to a mutual mistake. *See id.* at 846–47. In addition, communications and conduct both from the beginning of the negotiations to the issuance of the policy and after the policy went into effect supported the conclusion that the term was to be a part of the contract. *See id.* at 847. We affirmed. *Westchester Resco Co. v. New England Reinsurance Corp.,* 818 F.2d 2, 2 (2d Cir.1987) (per curiam).

Here, as in *Westchester Resco,* the District Court found that RD did not convey to ACE any objections to the terms of the binder. Likewise, the court found that after the policy was issued, RD and its agent CSIR did not notify ACE of their concerns despite having received several indications of ACE's position, including both the January 22, 1999 endorsement and the February 23, 1999 letter. Accordingly, we agree with the District Court that the terms of the binder were meant to be carried over into the policy. *See Westchester Resco,* 648 F.Supp. at 846 ("If the standardized terms of an unissued policy are to be read into the bargained terms of a binder, it seems appropriate to read the bargained terms of the binder into the standardized terms of the policy."), *aff'd,* 818 F.2d 2 (2d Cir.1987) (per curiam).

We find *Springer v. Allstate Life Ins. Co.,* 94 N.Y.2d 645, 710 N.Y.S.2d 298, 731 N.E.2d 1106 (2000), inapposite. *Springer* involved not the terms of an insurance contract but the policy's starting date. *See id.* at 648, 710 N.Y.S.2d at 299, 731 N.E.2d 1106. Because "an insurance bind-er is a temporary or interim policy until a formal policy is issued," *id.* at 649, 710 N.Y.S.2d at 300, 731 N.E.2d 1106, its starting date cannot be the starting date of the policy. Thus, the New York Court of Appeals found that "[u]nder the clear and unambiguous terms of the binder, coverage ceased when [the insurer] agreed to issue the policy. Coverage was then provided by the policy as of its start date." *Id.* at 650, 710 N.Y.S.2d at 300, 731 N.E.2d 1106. This, however, does not mean that the binder's terms cannot inform a court of the parties' intentions regarding the terms of the policy. *See* 1 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 13:7 (1997) ("The binder is acceptable documentary evidence pertaining to the terms of the agreement between the parties, regardless of whether the insured received it. . . .").

RD also argues that even if the binder can be read together with the final policy to provide a term with respect to which the policy is silent, the specific term here at issue is indefinite with respect to a material term—nowhere does it specify that the maximum loss ratio is 45%—and that New York law would deny enforcement of a contract provision that leaves a material term indefinite or the subject of future negotiations that never come to pass. *See, e.g., Joseph Martin, Jr., Deli-catessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981). This argument fails because the precise loss ratio percentage was not a material term nor was the provision indefinite. To the contrary, RD agreed to accept the final wording—and thus the maximum loss ratio—provided by ACE. In other words, ACE sought and obtained the right to review loss and exposure information and adjust premiums if it found that it was not earning enough money on the RD policy. If RD declined to pay the premium increase, the policy

would be subject to cancellation, and RD would be entitled to a pro rata refund of premiums already paid.

We have considered appellant's remaining arguments and find them to be without merit. For the reasons set forth above, we AFFIRM the judgment of the District Court.