CRUCIBLE MATERIALS
CORPORATION.,
Plaintiff,

v.

The AETNA CASUALTY & SURETY
COMPANY, Certain Underwriters at
Lloyd's of London, London Market
Companies, Excess Insurance Compa-
ny, Minister Insurance Company, Na-
tional Casualty Company of Detroit,
River Thames Insurance Company,
and World Auxiliary Insurance Corpo-
ration Limited, Defendants.

No. 97–CV–759 (HGM/GJD).

United States District Court,
N.D. New York.

July 6, 2001.

Hancock, Estabrook Law Firm, Syracuse, NY, Alan J. Pierce, of Counsel, Kirkpatrick, Lockhart Law Firm, Pittsburgh, PA, Thomas E. Birsic, James E. Scheuermann, John K. Baillie, of Counsel, for Plaintiff.

Mackenzie, Smith Law Firm, Syracuse, NY, Stephen T. Helmer, of Counsel, Simpson, Thacher Law Firm, New York City, Barry R. Ostrager, Robert H. Smit, Phv., of Counsel, Baach, Robinson Law Firm, Washington, DC, Mary E. Fechtig, Phv., Randolph Collins, Bruce R. Grace, of Counsel, Sugarman, Wallace Law Firm, Syracuse, NY, Timothy Perry, Andrew J. Leja, of Counsel, for Defendants.

## INTRODUCTION

MUNSON, Senior District Judge.

On June 7, 1996, plaintiff filed a complaint in the Western District of Pennsylvania seeking declaratory relief pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202, and to recover damages for breach of several insurance contracts.[1] On May 27, 1997, this action was transferred to the Northern District of New York and eventually assigned to this court. Currently before the court are five motions which include three summary judgment motions; two by the defendants and one by plaintiff. The remaining mo-

tion is a motion by London Market to strike portions of an affidavit. All aspects of these motions are hotly contested by the parties. The court will address each motion *seriatim.*

## FACTS

This case has developed a lengthy procedural history which includes two prior decisions from this court. For this reason, familiarity with the facts underlying plaintiff's claims is presumed.

## DISCUSSION

### I. *Summary Judgment*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *See Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990).

---

**1.** Plaintiff has since filed a Third Amended Complaint.

## II. *Travelers' Motions*

Generally, plaintiff's claims against Travelers involve general liability insurance policies (hereinafter "the Travelers Policies") that were issued to Crucible Materials Corporation ("Crucible") between 1956 and 1969, by Travelers' corporate predecessor, Aetna.[2] In the instant litigation, Crucible seeks to recover its costs for the abatement of several properties that were contaminated with hazardous wastes. Plaintiff contends that the terms and conditions of the Travelers Policies afford coverage for these abatement costs. In response, Travelers disclaims coverage and seeks summary judgment claiming that Crucible failed to provide timely notice of its claims. It also contends that New York's insurance law applies to all issues involving the Travelers Policies. For obvious reasons, the court must determine if New York law applies to plaintiff's claims before the substance of the instant motion can be addressed.

### A. *Choice of Law*

■ As an initial part of its summary judgment motion, Travelers contends that New York law should apply herein because the policies in question were made and delivered in New York. Plaintiff vigorously disagrees claiming that the Travelers Policies were actually delivered in Pennsylvania. After reviewing the parties respective positions, the court finds that New York law applies to all issues which relate to the Travelers Policies.

■ Choice of law rules are substantive rather than procedural. *See Crucible Materials Corp. v. Aetna Cas. & Sur. Co.*, 1998 WL 404239, at *2 (N.D.N.Y. July 15, 1998) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020,

1021, 85 L.Ed. 1477 (1941)). Normally, where federal jurisdiction is founded upon diversity, a district court must apply the choice of law rule of its forum state. *See Klaxon*, 313 U.S. at 496, 61 S.Ct. at 1021. However, Pennsylvania's choice-of-law rules apply in this case because it was originally filed in the Western District of Pennsylvania. *See Crucible Materials Corp.* 1998 WL 404239, at *2.

■ Pursuant to Pennsylvania's choice-of-law rules, the court must use an interest analysis, *see Melville v. American Home Assurance*, 584 F.2d 1306, 1311 (3d Cir.1978); *Compagnie des Bauxites v. Argonaut–Midwest Ins.*, 880 F.2d 685, 689 n. 9 (3d Cir.1989) (interest analysis applies to contract actions), and apply a two-pronged test. *See LeJeune v. E.W. Bliss Co. & General Electric Co.*, 85 F.3d 1069, 1071 (3d Cir.1996). This test requires the court to determine: (1) whether there is a "true conflict" or a "false conflict" among the states whose laws may apply; and (2) which state has a greater interest in seeing its laws applied. *See id.* A true conflict exists where the application of each state's laws furthers its own public policy but would yield a different result from the application of the other state's law. A false conflict exists where only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law. *See id.*

In this litigation, the court has already found and the litigants agree that a true conflict exists between the law of New York and Pennsylvania regarding how to trigger and apply insurance coverage. *See Crucible Materials Corp. v. Aetna Cas. & Sur. Co.*, 2000 WL 748104, at *4 (N.D.N.Y. June 5, 2000). For this reason, it is unnecessary to revisit this issue in the instant

---

**2.** Since Travelers responds to plaintiff's claims, the court shall refer to Travelers as

defendant instead of Aetna Casualty & Surety Company.

decision. Therefore, the court shall now address the second part of the Pennsylvania choice of law test.

■ The second prong of the Pennsylvania test requires a qualitative analysis of the contacts between the parties, the causes of action and the individual states' interests implicated by the asserted claims. *See LeJeune*, 85 F.3d at 1072. To accomplish this task, the Pennsylvania Supreme Court, in *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796 (1964), adopted an approach which considers the grouping of contacts found in the Second Restatement of Conflict of Laws, and the interests and policies that may be asserted by each affected states' jurisdiction. *See Compagnie des Bauxites*, 880 F.2d at 688–689. Section 188 of the Second Restatement lists the following contacts to be taken into account under the *Griffith* approach:

(a) the place of contracting;

(b) the place of negotiation of the contract;

(c) the place of performance;

(d) the location of the subject matter of the contract; and,

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2)(1971). These contacts are to be evaluated according to their relative importance with respect to the particular issue. *See id; Compagnie des Bauxites*, 880 F.2d at 689. Analysis of these factors indicate that New York, not Pennsylvania, has greater contact and, therefore, greater interest in the instant litigation.

### 1. Place of Contracting

■ This contact looks to the place where the last necessary act occurred to give the contracts in question their binding effect. *See Financial Software Sys., Inc. v. First Union Nat'l Bank*, 1999 WL 1241088 (E.D.Pa. Dec.16, 1999). In this case, it appears that the Travelers Policies were drafted in New York as plaintiff used a New York City broker, Beardsley, to obtain the policies. Furthermore, contract negotiations took place with Travelers' New York City office. Travelers also delivered the policies to plaintiff's broker in New York. Despite the weigh of this evidence, however, the parties dispute the location where the policies were actually executed. Therefore, the court is unable to determine which state this contact favors.[3] Fortunately, it is unnecessary to resolve this issue as the remaining factors clearly demonstrate New York's overriding interest in this litigation.

### 2. Place of Negotiation

It is clear that the Travelers Policies were negotiated in New York between Travelers and plaintiff's broker. As stated above, Beardsley was Crucible's broker

---

**3.** Pennsylvania's choice-of-law rules state that an insurance contract is guided by the law of the state in which it is made. *See Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir.1999). Furthermore, an insurance contract is made in the place of delivery. *See Travelers Indemnity Co. v. Fantozzi*, 825 F.Supp. 80, 84 (E.D.Pa.1993). Knowing this, the litigants spend considerable time arguing about where the contracts were delivered and whether plaintiff's broker acted as Crucible's or Travelers' agent for the purpose of delivery. To support its position, Travelers seeks to apply New York law which states that a broker acts as the insured's agent for delivery purposes. In response, plaintiff insists that Pennsylvania's law, which applies the exact opposite rule, should apply. Each party provides compelling evidence to support their respective positions. However, even if the court were to determine that the Travelers Policies were delivered in Pennsylvania, this contact itself is insufficient to sway the larger interest in this litigation away from New York under the test set forth in *Griffith*.

and was responsible for obtaining the policies from Travelers. In an attempt to provide evidence to the contrary, plaintiff offers an affidavit from a former employee, William Knoell, who states that Crucible's insurance contracts were generally procured by Pittsburgh-based employees. However, he does not specifically discuss how or through whom the Travelers Policies were obtained. Moreover, a deposition taken of Knoell shows that Beardsley obtained insurance for Crucible with little oversight from the company. It does not show that the Travelers Policies were not negotiated for in New York; therefore, this contact falls in favor of New York.

### 3. *Place of Performance*

The Travelers Policies are general liability insurance contracts which may indemnify plaintiff from environmental liability. The specific issue in this case stems from properties either owned or used by Crucible which have been contaminated with hazardous byproducts of its metal-forming business. Although some of contaminated property at issue lies outside of New York, the plurality of sites for which plaintiff seeks insurance coverage are located within New York. For this reason, defendant's performance pursuant to the Travelers Policies, if any, will occur principally in New York State. The contact also favors New York.

### 4. *Location of the Subject Matter*

The subject matter implicated by the Travelers Policies is also located in New York. Although the Policies could have potentially covered many locations, plaintiff's claims involve mainly property in New York. As such, this factor also falls in favor of New York.

### 5. *Place of Incorporation*

This factor does not favor either New York or Pennsylvania as neither Travelers nor Crucible are incorporated in these States.

### 6. *Weighing the Contacts*

Although there is some contact with Pennsylvania due to the fact that Crucible was headquartered in that State during relevant period, the majority of contacts implicate New York State. For this reason, the court finds that New York has the greater interest in the claims at issue in this litigation. Therefore, New York law shall apply to the Travelers Policies rather than Pennsylvania's.

### B. *Summary Judgment*

Travelers also seeks summary judgment asserting several defenses to plaintiff's claims. More specifically, plaintiff seeks indemnification for past, present and future expenses which it has or will incur for the abatement of several hazardous waste sites. In this case, plaintiff is responsible for the toxic waste clean-up of the following locations: (1) the Conservation Chemical Company of Illinois, Inc., ("CCCI") site; (2) the Trent Tube Main Plant site; (3) the Pierce/York Oil site; and (4) the Syracuse Plant site.[4] As Travelers' defenses are specific to location, the court will address the instant motion in regard to each location.

### 1. *The Syracuse Plant*

In regard to the Syracuse Plant location, Travelers argues that Crucible seeks coverage for non-existent claims and non-existent property damage. Specifically, it contends that the Travelers Policies only cover injuries to third parties that were

---

4. The Pierce/York Oil and Syracuse Plant Locations are both located in New York. The remaining sites are located outside of New York State.

caused by the insured. Therefore, the mere existence of property damage is not enough to trigger coverage; instead, there must be a third party claiming an injury. Since plaintiff's only claims are for damage to its own property, Travelers maintains that Crucible is not entitled to coverage under the terms of the Travelers Policies.

In response, plaintiff agrees with Travelers and seeks dismissal of these claims without prejudice. Not surprisingly, defendant agrees to dismissal but reserves its right to seek attorney's fees. In light of the parties' consent, the court dismisses plaintiff's Syracuse Plant claims without prejudice.

### 2. The CCCI Site

The CCCI site is a landfill in Gary Indiana, which operated from 1967 to 1985, as a waste transfer, storage and disposal facility. According to CCCI records, Crucible sent hydrofloric and nitric hydrofluoric acids to the CCCI site between 1973 and 1975, from its Trent Tube facility. In 1985, the Environmental Protection Agency ("EPA") issued an Administrative Order to nineteen individual companies requiring the immediate abatement of hazardous waste contamination at the CCCI site.[5] In response, these companies formed the 6500 Industrial Highway Group ("the Group"), to perform the required abatement. Then, in July of 1989, the Group commenced litigation against ninety companies, including Crucible, in which Crucible was found jointly and severally liable for the clean-up of the CCCI site.

In the instant litigation, Crucible seeks indemnification from Travelers under the property damage provisions of the Travelers Policies for abatement of the CCCI site. In its summary judgment motion, Travelers argues that the Policies do not cover the claimed property damage, i.e., the hazardous waste clean-up, as it occurred in 1973, four years after the Policies expired. Since the Policies do not provide coverage in perpetuity, Travelers contends that Crucible's post-policy pollution claims must be dismissed.

Predictably, plaintiff disagrees with Travelers arguing that the Policies do not exclude coverage under the specific circumstances of this case. To support this position, Crucible rests its proverbial hat upon several substantive oddities associated with environmental litigation. Specifically, plaintiff claims that CERCLA subjects Crucible to joint, several, strict and *retroactive* liability for abatement of the CCCI site. As a consequence of this liability scheme, plaintiff could be required to pay for the abatement of contamination caused by other companies. Since these companies disposed of their wastes while the Policies were in effect, plaintiff insists that the Policies were triggered during the relevant coverage periods.

Unfortunately, the New York Court of Appeals has not decided whether comprehensive general liability insurance policies cover property damage arising from the actions of third parties at a time when the insured was not connected with the property in question. Furthermore, it appears that only one New York court has address this specific issue. *See Long Island Lighting Co. v. Aetna Cas. & Sur. Co.,* Index No. 604715/97 (N.Y.Sup.Ct. Jan. 6, 1999) (Gammerman, J). Although the *Long Island Lighting Co. ("LILCO")* decision's precedential value is undermined slightly by virtue of it being unreported, the opinion is directly on point and requires this court's consideration.

---

**5.** Crucible was not one of the nineteen companies named by the EPA.

In *LILCO*, the court held that general liability insurance policies acquired by the plaintiff would not cover liability for property damage where the liability developed after expiration of the policy period. *See id.* at 7. As a basis for this decision, the court found that the insured, which was jointly and severally liable for abatement of a hazard waste site under CERCLA, had no connection with the contamination at issue. Absent any factual or legal connection to the site, the court reasoned that it would be unjust to subject the insurer to liability, because it would have been impossible for the insurer to predict its potential environmental liability under CERCLA, which was enacted after the policies had expired. *Id.* at 6. For these reasons, the court concluded that the defendant insurance companies had no duty to indemnify the plaintiff for property damage that occurred prior to LILCO's involvement with the contaminated sites.

Although no other New York court seems to have addressed this issue, a few courts from other jurisdictions have also considered the matter. *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 1991 WL 490026 (W.D.Mich. Sept.9, 1991), is particularly instructive. In *Upjohn*, the plaintiff also purchased comprehensive general liability policies that expired prior to its involvement with certain hazardous waste sites. During the effective dates of the policies, these sites were contaminated by third parties and plaintiff later became jointly and severally liable for waste abatement under CERCLA. Plaintiff then sued its insurer for indemnification under the expired policies. The *Upjohn* court rejected plaintiff's claims after finding that it had "no legal or factual relationship, connection or involvement with the damaged property." *Id.* at *5. After acknowledging that the policies in question predated CERCLA and the idea of strict environmental liability, the court also concluded that it would

be unfair to hold an insurer responsible for not explicitly limiting its liability to property with which the insured had no connection. *See id.* Moreover, the court determined that holding the insurer liable under these circumstances would subject the insurance company to risks which it could never have reasonably evaluated. *See id.*

In the instant case, plaintiff also seeks to hold an insurer responsible for the cost of abating contaminated sites that were damaged by third parties prior to its contact with the property. Although plaintiff concedes that Crucible's involvement occurred after the Travelers Policies expired, it insists that Travelers is nonetheless liable because the harm in question took place during the relevant periods of coverage. The court disagrees with plaintiff for the reasons articulated *LILCO* and *Upjohn.* Specifically, the court finds that the contamination of the CCCI property which has rendered Crucible liable for the site's clean-up occurred after the Travelers Policies expired. Crucible's joint and several liability under CERCLA and the fact that third parties damaged the CCCI site during the coverage period does not actuate the Travelers Policies; such a trigger requires Crucible's direct involvement. *See Upjohn*, 1991 WL 490026, at *5. Since Crucible had no legal or factual connection with the CCCI site during the coverage period, Travelers is not required to indemnify plaintiff for its abatement costs.

Finally, plaintiff contends that Travelers should be held liable for its remediation costs because the Policies themselves do not specifically limit liability to property damage inflicted by the policy holder. Once again, the court disagrees. The Travelers Policies predate CERCLA's strict environmental liability provisions. For this reason, Travelers was not in a position to craft a premium or accurately

evaluate its potential liability for the type of environmental damage for which Crucible is now liable. Travelers was also not able to limit its liability for the property damage caused by third parties. If the court were to adopt plaintiff's position and hold an insurer responsible for failing to limit its third party environmental liability, it would then subject insurance companies to risks which they could not possibly have foreseen or predicted at the time of contracting—such an action would be patently unjust. For this reason and those articulated above, the court finds that Travelers is not liable to Crucible for the cost of abatement of the CCCI site under the Travelers Policies. Therefore, plaintiff's CCCI claims are hereby dismissed.

### 3. *Trent Tube Site*

#### A. *Late Notice Issue*

The Trent Tube site is a thirty-two acre parcel of land in East Troy, Wisconsin, which operated from 1941 to 1985, as a stainless steel tube manufacturing plant. During this period, Trent Tube produced hazardous wastes, which included chlorinated solvents, acids and toxic metals, as a byproduct of its manufacturing processes. In 1981, the EPA began investigating the Trent Tube Main Plant ("Main Plant") for either environmental compliance or suspected toxic releases into the environment.[6] The EPA continued to investigate the Main Plant throughout the 1980's, but its activities culminated in January 1988, when Trent Tube received a letter from Ecology & Environment, Inc., which is a consulting firm for the EPA that evaluates suspected hazardous waste release sites for placement on the National Priorities List. This letter purportedly informed Trent Tube that an inspection would be undertaken in the Main Plant on March 2

& 3, 1988. On March 1, 1988, the litigants agree that Crucible, which owns the Trent Tube facility, informed Travelers of the imminent inspection. As a result of this inspection, plaintiff learned, through a Site Inspection Report received by Crucible on February 7, 1989, that the soil, surface water and groundwater surrounding the Main Plant site was contaminated with hazardous wastes. On March 6, 1989, Crucible forwarded this report to Travelers advising that the Main Plant might be listed on the National Priorities List and subjected to an Immediate Removal Action.

In its summary judgment motion, Travelers seeks to avoid liability for abatement of the Main Plant location claiming that Crucible provided late notice of an occurrence at the site. More specifically, defendant contends that Crucible knew or should have known of its potential liability for an environmental clean-up in 1981, after the EPA informed it about suspected hazardous contamination at the Main Plant. Travelers argues that the EPA's notification alone was sufficient to indicate that an "occurrence" had taken place at the Main Plant for which Travelers should have been notified. In the alternative, Travelers describes incidents in 1984 and 1985, wherein it believes that evidence of an occurrence and the potential for Crucible's liability became abundantly clear. Finally, it maintains that Crucible should have known about an occurrence at the very latest in June or September of 1986 when the EPA declared the Main Plant "environmentally significant."

In response, plaintiff argues that it properly notified Travelers of an occurrence at the Main Plant site. Specifically, it contends that Crucible's claim for damages is limited to contamination of groundwater by volatile organic compounds

---

**6.** The litigants dispute the nature of these investigations.

("VOCs"), including TCE and TCA. As such, Crucible insists that it notified Travelers of a potential occurrence as soon as it learned that a site inspection would be conducted in March 1988. Moreover, plaintiff maintains that it provided this notice several months before a Site Inspection Report was issued by the EPA, seven years before Crucible incurred any remediation costs and eleven years before a final remedial closure plan was submitted. For these reasons, plaintiff believes that it informed Travelers of an occurrence in a timely fashion.

▇▇▇▇ "Under New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Commercial Union Ins. v. Int'l Flavors & Fragrances*, 822 F.2d 267, 271 (2d Cir.1987). Therefore, late notice is a complete defense for a defendant regardless of whether the insurance company was prejudiced. *See Utica Mut. Ins. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 121 (2d Cir.1984). In evaluating whether the insured failed to give timely notice such that the insurer is relieved of its obligations under an insurance policy, courts must answer two questions. *See Olin Corp. v. Ins. Co. of North America*, 743 F.Supp. 1044, 1053 (S.D.N.Y.1990). "First, the court must decide when an insured's obligation to give notice accrued." *Id.* "Courts have consistently held that the obligation to provide notice accrues when 'the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim.'" *Id.* (*quoting Commercial Ins.*, 822 F.2d at 272). "New York law applies an objective test, asking what the insured's officers 'reasonably could or should have concluded.'" *Id.* (*quoting*

*Utica Mutual*, 748 F.2d at 122). "Second, the court must decide whether the insured did in fact provide timely notice." *Olin*, 743 F.Supp. at 1053. Absent an excuse or mitigating factor, the question of compliance with a notification-of-occurrence provision may be decided by the court as a matter of law. *See id.*

In the instant case, plaintiff claims to have notified Travelers about its potential liability for groundwater contamination at the Main Plant immediately after learning about the EPA's site inspection. In response, defendant claims that the Main Plant site was investigated for many years prior to 1988, and that these investigations constituted occurrences under the Travelers Policies. Moreover, it suggests that the EPA's investigations and the very real potential for the site being placed on the National Priorities List would lead a reasonable person to realize the possibility of a claim.

After reviewing the litigants' respective positions, it is clear that the history of environmental investigation surrounding the Main Plant should reasonably have suggested the possibility of a claim to Crucible's officers. Specifically, the Main Plant site has been the subject of many environmental investigations. In fact, the EPA and the Wisconsin Department of Natural Resources ("WDNR") started investigating the plant in June of 1981, and reported a series of incidents or violations for the next several years. These investigations concerned some regulatory compliance violations, *see* Alcabes Aff., Ex. 27 & 31; Dkt. No. 136, but also reported potential hazardous discharges into the environment. For example, in late 1982, the WDNR reported that the Main Plant's settling pond was a "major problem area."[7] *See* Alcabes Aff., Ex. 32, at ¶ 2.

---

7. It also described some changes made to the

facility to alleviate the problems with the

Moreover, as early as June of 1981, Crucible clearly suspected that it had released heavy metals into the environment. *See* Alcabes Aff., Ex. 28.

The weight of the preceding evidence indicates that problems existed at the Trent Tube site involving the discharge of heavy metals into the environment. It is also clear that Crucible was aware of these problems beginning in 1981. Therefore, plaintiff should reasonably have known about the discharge of heavy metals in the early 1980's. However, Crucible does not seek remuneration for the abatement of heavy metals, but claims coverage for the costs of cleaning groundwater contaminated by VOCs.[8] As such, the court must also determine when plaintiff should have known about groundwater contamination at the Main Plant.

Although plaintiff feigns ignorance to this type of contamination until 1988, there is ample evidence showing that Crucible knew about potential groundwater contamination beginning in 1983. Specifically, in October of 1983, the WDNR reported that several drums of hazardous wastes were found open and/or leaking. *See* Alcabes Aff., Ex. 33. Although the *exact* contents of these containers is unclear, the WDNR report states that VOCs' were among the wastes stored at the Main Plant site. *See id.* Furthermore, the record also shows that the WDNR conducted another inspection of the Main Plant in 1984. *See* Alcabes Aff., Ex. 34. In its inspection report, the WDNR stated that soil and groundwater contamination at the Main Plant was a potential hazard to the environment. *See id.* Although the scope of contamination was unknown at that time, this report clearly shows that Crucible knew that the site's groundwater had been contaminated.

In addition to the above evidence, there is further compelling proof that Crucible knew about groundwater contamination at the Main Plant site prior to 1988. For example, in 1985, Crucible certified to the EPA that hazardous wastes were discharged into the environment during Trent Tube's forty year history. *See* Alcabes Aff., Ex. 37. Specifically, it stated that approximately 100 gallons of TCE spilled onto the ground from surface tank. *See id.* Furthermore, in 1986, the WDNR reported numerous spills of VOCs and deemed the site to be environmentally significant. *See* Alcabes Aff., Ex. 38. Finally, in 1986, the EPA also determined that the location was environmentally significant. *See* Alcabes Aff., Ex. 39.

■ In light of the preceding, the court finds that Crucible should have known about the possibility of a claim prior to 1988 when it actually notified Travelers of an occurrence at the Main Plant location. In fact, the evidence shows that Crucible knew or should have known of a groundwater occurrence beginning in 1984, after the WDNR reported that groundwater contamination at the Main Plant was a potential hazard to the environment.[9]

---

Trent Tube settling pond.

8. The parties dispute whether plaintiff may limit its claims to its groundwater abatement costs. Specifically, Travelers argues that for purposes of late notice analysis the continuing contamination of the Main Plant site must be considered one occurrence. *See generally Olin*, 743 F.Supp. at 1044. Fortunately, resolution of this dispute is unnecessary. Even if the court limits plaintiff's claims to ground-

water contamination, it is still clear that Crucible failed to timely notify defendant of a groundwater related occurrence.

9. However, even if this evidence could be ignored, the latest that Crucible should have known of such an occurrence was in 1986, when the WDNR and the EPA declared the site environmentally significant.

Therefore, Crucible's obligation to notify Travelers of an occurrence accrued in January of 1984, which was over four years prior to when it actually notified the defendant.[10]

■ With this issue resolved, the court must next decide whether Crucible did provide timely notice. In New York, even short delays providing notice are unreasonable as a matter of law. *See Olin*, 743 F.Supp. at 1053; *American Home Assurance Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir.1993) (citing cases). In fact, even delays as short as 29 days have been found to be unreasonable. *See State of New York v. Blank*, 27 F.3d 783, 796 (2d Cir.1994) (*citing Gov't Employees Ins. Co. v. Elman*, 40 A.D.2d 994, 338 N.Y.S.2d 666, 667 (2d Dep't 1972)). Moreover, New York courts routinely find delays of less than ten months to be unreasonable. *See id.*

In the instant case, Crucible delayed providing notice to Travelers about the Main Plant site for over four years. As plaintiff has not provided a valid excuse or any other acceptable mitigating factor for this delay, the court finds that Crucible failed to provide timely notice as a matter of law. For this reason, the court grants Travelers' motion for summary judgment with respect to the Main Plant site. These claims are hereby dismissed.

### B. *Waiver Issue*

■ Under New York law, an insurer can waive any defense not articulated in its disclaimer of coverage. *See Commercial Ins.*, 822 F.2d at 274. In New York, "an insurer is deemed, as a matter of law, to have waived a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *State of New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991); *Nestegg Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 87 F.Supp.2d 144, 148 (N.D.N.Y.2000).

In this case, plaintiff argues that Travelers waived its late notice defense. Specifically, it claims that Travelers waived the defense in a January 31, 1990, letter which identified a number of obstacles to coverage but did not invoke the late notice defense. According to Crucible, Travelers' failure to assert late notice in this letter constitutes an intentional waiver of the defense. Defendant denies any waiver claiming that it lacked sufficient knowledge to assert a late notice defense until six months after it sent the January of 1990, letter. It also argues that the January letter was merely an agreement to investigate plaintiff's claim for coverage and that it specifically reserved its rights to assert future defenses. Moreover, defendant claims that Travelers did not learn about a potential late notice defense until after it investigated Crucible's claim for coverage.

■ In New York, a waiver of a defense must be a knowing and intentional relinquishment of a right. In this case,

---

**10.** In its memorandum of law, plaintiff argues that it did not *actually* learn that the groundwater surrounding the Main Plant had been contaminated until the EPA's consultants issued a site inspection report in January of 1988. For this reason, it maintains that Crucible's obligation to notify defendant of an occurrence did not arise until 1988. This argument is misplaced. In New York, the obligation to provide notice accrues when the circumstances known to the insured at that time would have suggested to a reasonable person the *possibility* of a claim—not the *actuality* of a claim. Therefore, while Crucible may not have *confirmed* that it polluted the Main Plant's groundwater until 1988, the evidence suggests the possibility of a claim in 1984.

there is no evidence, offered by plaintiff or otherwise, indicating that Travelers knew or could have known of the late notice defense in early 1990. To the contrary, plaintiff's only proof, the January 1990 letter, shows that Travelers needed further information to investigate plaintiff's claims and determine if Crucible was entitled to coverage. *See* Alcabes Aff., Ex 56; Dkt. No. 139. After obtaining and digesting this information, Travelers promptly asserted its late notice defense and disclaimed coverage. *See* Alcabes Aff., Ex 58. In light of this evidence, it is clear that Travelers lacked sufficient knowledge about plaintiff's Main Plant claims to assert a late notice defense in January of 1990. Therefore, the court finds that defendant did not knowingly waive the late notice defense.

### 4. *Pierce/York Oil Site*

Pierce Oil is a landfill in Moira, New York, to which Crucible allegedly sent quantities of hazardous wastes in the early 1960's. Halcomb Steel is one of plaintiff's corporate predecessors which operated Crucible's Syracuse Plant in the 1960's. In July of 1988, Crucible received a letter from the EPA addressed to Halcomb which stated that the EPA had undertaken reclamation actions to remove contamination at the Pierce site. It also indicated that the EPA believed Halcomb was a potentially responsible party for contamination of the site. Five months subsequent to receiving this letter, Crucible notified Travelers of a "potential problem" at the Pierce site. According to defendant, Crucible did not immediately inform Travelers because it believed that notice was unnecessary by virtue of the letter being addressed to Halcomb Steel.

In its motion for summary judgment, Travelers argues that this five month delay providing notice was untimely under New York State law. It also suggests that the EPA's July of 1988 letter constitutes a claim rather than an occurrence. Furthermore, Travelers insists that the doctrine of excuse, which is applicable to late notice of *occurrence* defenses, does not apply to late notice of *claim* issues. Therefore, it contends that any explanation that plaintiff offers cannot excuse the untimeliness of Crucible's notice of claim.

In response, plaintiff argues that the EPA's letter could not constitute notice of a claim, because a claim is defined as an assertion that the insured may be liable for some type of damages. Since the letter was addressed to Halcomb, plaintiff maintains that the letter could not state a claim against Crucible. It also contends that Crucible did not learn that it was potentially liable for remediation of the Pierce site until 1991, after the EPA sent a second letter stating that it believed Crucible was Halcomb's corporate successor. Moreover, since the EPA did not immediately seek remuneration, plaintiff insists that its "precautionary notice" in 1988, constituted timely notice of a claim that was not actually asserted until 1991.

Plaintiff also argues that the doctrine of excuse applies to late notice of claim issues. Moreover, it offers the excuse of a good faith belief that Crucible was not liable for the Pierce site contamination as the EPA's letter was addressed to Halcomb. Since the reasonableness of an asserted excuse is an issue of fact, Crucible maintains that the validity of its excuse cannot be resolved through summary judgment. The court will address the latter issue first.

Contrary to defendant's belief, the court finds that the doctrine of excuse applies where the insured has a good faith belief of non-liability for a potential claim. In arriving at this conclusion, the court recognizes that the Second Circuit, in *State of*

*New York v. Blank, supra,* and *American Ins. Co. v. Fairchild Indus., Inc.,* 56 F.3d 435 (2d Cir.1995), previously determined that the doctrine does not apply under these circumstances. *See also Garfield Slope Hous. Corp. v. Pub. Serv. Mut. Ins., Co.,* 973 F.Supp. 326 (E.D.N.Y.1997) (following the Second Circuit's decision that doctrine does not apply to late notice of claim issues); *State of New York v. Ludlow's Sanitary Landfill, Inc.,* 50 F.Supp.2d 135 (N.D.N.Y.1999) ("[a]n insured cannot excuse delay in giving notice of claim based on a belief of non-liability no matter how well-founded that belief may be."); *Rooney v. Chicago Ins. Co.,* 2001 WL 262703 (S.D.N.Y. Mar.16, 2001) ("there is no valid excuse under New York law for failing to give reasonable notice when there is an actual claim that triggers a notice of claim provision requiring immediate notice").

However, since the Second Circuit rendered its interpretation of New York law, the Appellate Division for the Third Department expressly rejected the *Fairchild* decision. *See Reynolds Metal Co. v. Aetna Cas. & Sur. Co.,* 259 A.D.2d 195, 696 N.Y.S.2d 563 (3rd Dep't 1999). Specifically, the Appellate Division dismissed the notion that a defense based upon the reasonableness of a belief in non-liability is permitted in cases involving late notice of occurrence, but not late notice of claim. *See id.* at 201, 696 N.Y.S.2d at 568. Noting that there are no New York cases specifically upholding such a distinction, the Appellate Division found "no reason why a failure to give a timely notice of claim should not be excused by an insured's good-faith belief in non-liability . . ." *Id.*

Although the Third Department alone has rejected the Second Circuit's interpretation in *Fairchild,* this court follows the precedent established in *Reynolds Metal* since it reflects the current state of New York law as interpreted by a New York court. Fortunately, this court's decision is fortified by the New York Court of Appeals' decision in *Empire City Subway Co. v. Greater N.Y. Mut. Ins. Co.,* 35 N.Y.2d 8, 358 N.Y.S.2d 691, 315 N.E.2d 755 (1974). In *Empire,* the Court of Appeals was asked to decide whether an insured had complied with a liability policy that required notice of an accident or claim be given to the insurer immediately. *See id.* at 10, 358 N.Y.S.2d at 692, 315 N.E.2d at 755–756. Ultimately, the court determined that plaintiff failed to offer any credible explanation for the delay in providing notice. *See id.* at 14, 358 N.Y.S.2d at 695, 315 N.E.2d at 758. However, it also noted that under certain circumstances a good-faith belief of non-liability may excuse failure to provide timely notice. *See id.* at 13, 358 N.Y.S.2d at 694, 315 N.E.2d at 757. Significantly, the court considered the merits of plaintiff's excuse rather than determining that the excuse offered was irrelevant. *See id; see also Reynolds Metal,* 259 A.D.2d at 201, 696 N.Y.S.2d at 568.

In light of the *Reynolds Metal* decision and the Court of Appeal's willingness to consider the excuse of non-liability in late notice of claim cases, this court finds that the doctrine of excuse applies in the instant case. However, application of the doctrine does not automatically resolve the instant motion in plaintiff's favor. In New York, an insured's good-faith belief in its non-liability, when reasonable, may excuse a delay in notifying an insurer of a potential claim. *See Marinello v. Dryden Mut. Ins. Co., Inc.,* 237 A.D.2d 795, 796, 655 N.Y.S.2d 156, 156 (3rd Dep't 1997). Generally, the reasonableness of the insured's belief is a question of fact for the jury. *See id.* at 797, 655 N.Y.S.2d at 156. However, circumstances exist where a

court may resolve questions of reasonableness as a matter of law. *See Spa Steel Prods. Co. Inc. v. Royal Ins.*, 282 A.D.2d 864, 722 N.Y.S.2d 827, 829 (3rd Dep't 2001) (finding that the Supreme Court correctly determined as a matter of law that an insurer was required to indemnify insured); *Argentina v. Otsego Mut. Fire Ins. Co.*, 86 N.Y.2d 748, 631 N.Y.S.2d 125, 655 N.E.2d 166 (1995) (affirming a Supreme Court decision which awarded insured damages in the full amount of an insurance policy); *Vradenburg v. Prudential Prop. & Cas. Ins. Co.*, 212 A.D.2d 913, 622 N.Y.S.2d 623 (3rd Dep't 1995) (concluding that plaintiff had a good faith belief in non-liability as a matter of law); *Briggs v. Nationwide Mut. Ins. Co.*, 176 A.D.2d 1113, 575 N.Y.S.2d 413 (3rd Dep't 1991) (same).[11]

In this case, plaintiff bases its belief in non-liability upon the fact that the EPA's letter concerning the Pierce Oil site was addressed to Halcomb. For this reason, plaintiff contends that it reasonably believed that a claim was not being asserted against Crucible and it would not be liable for abatement of the site. Unfortunately for plaintiff, the court disagrees that this belief was reasonable under the circumstances. Although the EPA's letter, which sought reimbursement for abatement of the site, was addressed to Halcomb, Crucible clearly knew that it is Halcomb's corporate successor and could be liable for claims against Halcomb. For this reason, plaintiff's belief that a claim had not been asserted against Crucible was unreasonable as a matter of law.

 With this issue resolved, the court now turns to the question of plaintiff's

delay in notifying defendant. As articulated above, delays as short as 29 days have been found unreasonable as a matter of law. *See Blank*, 27 F.3d at 796. In this case, plaintiff waited five months before informing Travelers about the claims asserted in the EPA's letter. Since even such a short delay is fatal under New York law, plaintiff's Pierce Oil claims must be dismissed. Therefore, defendant's summary judgment motion is hereby granted.

### III. London Market's Motion for Summary Judgment

Currently before the court are a motion by Certain Underwriters at Lloyd's and London Market (collectively "Underwriters") for joiner with Travelers' summary judgment motion and their independent motion for summary judgment. Underwriters are a group of insurance companies that issued two excess insurance policies to Crucible first in 1957 and later in 1968. Familiarity with the facts pertinent to these policies is once again assumed. *See Crucible Materials Corp. v. Aetna Cas. & Sur. Co.*, 2000 WL 748104 (N.D.N.Y. June 5, 2000). With these motions, Underwriters seeks: (1) to apply New York law rather than Pennsylvania law with respect to Crucible's alleged failure to provide timely notice; and (2) to dismiss plaintiff's claims because of late notice and after-acquired liability. The court shall address these issues *seriatim*.

### A. Depecage

 First and foremost, Underwriters asks the court to apply New York law, instead of Pennsylvania law, in regard to the late notice defense. Previously, this

---

11. The court recognizes that these cases each resolved the reasonableness of an insured's belief in the plaintiffs' favor. While the court has not found any New York decision resolving this issue in a defendant's favor, the refer-

enced cases indicate a willingness to resolve questions of reasonableness as a matter of law. Therefore, this court is free to determine whether Crucible's belief in its non-liability was reasonable as a matter of law.

court determined that Underwriters' policies are governed by Pennsylvania law rather than New York law. *See Crucible Materials Corp.*, 2000 WL 748104. Despite this decision, Underwriters now asks the court to employ what is known as depecage to apply Pennsylvania and New York law to different aspects of plaintiff's claims.[12] It argues that such an action is appropriate under Pennsylvania's choice of law analysis, which is conducted on a issue specific basis. Applying this approach, Underwriters contends that New York has a greater interest in having its notice of claim provisions applied in this case, because Crucible's claims mostly involve contact with New York. Plaintiff, of course, contests the application of depecage citing several cases from federal courts in Pennsylvania that do not apply the principle.

After considering the parties' respective positions, the court finds that the use of depecage is not clearly accepted in Pennsylvania. In fact, no Pennsylvania court has ever applied the depecage principle in a reported decision. Nonetheless, in *Broome v. Antlers' Hunting Club*, 595 F.2d 921, 924 (3d Cir.1979), the Third Circuit determined that Pennsylvania would apply the depecage principle in certain circumstances as it is consistent with the State's choice of law provisions. Since this decision was published, several federal courts have distinguished *Broome* and refused to apply depecage to claims involving personal injury claims and other torts. *See Tyson v. Great Atl. & Pac. Tea Co., Inc.*, 812 F.Supp. 63 (E.D.Pa.1993); *Racz v. R.T. Merryman Trucking, Inc.*, 1994 WL 124857 (E.D.Pa. Apr.4, 1994); *Jones v. Southeastern Pa. Transp. Auth.*, 1993 WL 141646 (E.D.Pa. Apr.30, 1993). However, these cases, upon which plaintiff relies, are

inopposite as they concern tort rather than contract cases.

In regard to the issue at hand, i.e., insurance contracts, there is little precedent to assist the court in resolving the instant dispute. In fact, the court has found only one decision interpreting Pennsylvania law that has applied depecage to a case involving an insurance contract. *See Chemetron Inv., Inc. v. Fid. & Cas. Co. of New York*, 886 F.Supp. 1194 (W.D.Pa. 1994). The *Chemetron* decision involved liability insurance contracts which contained pollution exclusion provisions. In *Chemetron*, the parties disputed whether Illinois or Pennsylvania law controlled insurance coverage issues including the referenced pollution exclusion provisions. In its decision, the court determined that Illinois had a substantial interest in the interpretation of insurance contracts issued by an Illinois company and performed in Illinois. Therefore, the court used the depecage principle to apply Illinois law to the contract's coverage issues.

 In the instant case, Underwriters suggests that use of depecage is appropriate under Pennsylvania's choice of law provisions and asks the court to apply it to the instant claims. The court disagrees and declines to apply depecage in this case. Depecage is an unusual and drastic principle that should be applied with the greatest trepidation. Although the federal courts in the Third Circuit accept depecage, the Pennsylvania state courts have never applied the principle. Absent clear instruction from the Pennsylvania courts, this court will not apply depecage to arbitrarily parcel the use of Pennsylvania's insurance law. Therefore, Pennsylvania law shall apply to plaintiff's claims against Underwriters.

**12.** Depecage is a choice of law principle whereby issues in a single case are decided according to the laws of different states. *See*

*Kelly v. Ford Motor Co.*, 942 F.Supp. 1044, 1046 n. 2 (E.D.Pa.1996).

## B. Late Notice Defense

 Pennsylvania requires proof that an insurer has been prejudiced by late notice of a claim or occurrence. *See Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977) (holding that late notice to an insurance company releases the insurer from its obligations under the policy only where the insurer has been prejudiced by the untimely notice). In this case, Underwriters invokes the late notice defense but does not offer any proof of prejudice. In the absence of any evidence of prejudice, the court rejects Underwriter's reliance upon this defense and denies defendant's motion for summary judgment with respect to the Trent Tube and Pierce Oil sites. The court will now address Underwriters motion for summary judgment over plaintiff's CCCI site claims.

## C. CCCI Site

 Underwriters attacks plaintiff's claims concerning the CCCI site arguing that the pollution which caused Crucible's liability under CERCLA occurred after expiration of its excess policies. This position is nearly identical to that taken by Travelers in its motion except that Underwriters relies upon *Koppers Co. v. Ins. Co. of North America*, which is an unreported decision from the Eastern District of Pennsylvania. In *Koppers*, the court addressed the identical issue found in the instant case. It determined that the insurer was not liable to the insured for the abatement of hazardous waste contamination that occurred after its liability policies had expired.

In this case, Underwriters urges the court to adopt the Koppers decision and dismiss Crucible's claims regarding the CCCI site. Unfortunately, this court has not discovered any *published* state or federal decisions that address the after-acquired liability issue. However, the Kop-

pers opinion is consistent with the position previously articulated by this court in Travelers' motion for summary judgment. Since the court cannot find a contrary decision from any Pennsylvania court, plaintiff's CCCI claims are also dismissed for the reasons stated in connection with Traveler's motion.

## D. Remaining Issues

Although the court denied aspects of its summary judgment motion, the question of Underwriters' liability to Crucible as a matter of law remains unsettled. Specifically, the insurance contracts at issue are excess liability policies that are only triggered when the underlying insurance coverage is exceeded. In this case, the court determined that Crucible is not entitled to coverage under its general liability insurance policies. In light of this determination, it is now unclear whether Crucible is entitled to coverage under its excess policies. Rather than resolve this issue *sua sponte*, the court seeks additional briefing from the parties that specifically addresses whether Crucible is entitled to excess coverage where all claims against the general liability carrier have been dismissed.

## IV. Underwriter's Motion to Strike

The next matter before the court is a motion by Underwriters to strike paragraph 3 of the affidavit of Thomas Birsic, who is an attorney for plaintiff. This affidavit was filed as part of Crucible's opposition to Underwriters' summary judgment motion in an attempt to distinguish defendant's reliance upon *Koppers Co. v. Ins. Co. of North America.* The affidavit references an excess liability insurance policy issued to Crucible for the policy period of April 1, 1968, to April 1, 1969. Plaintiff uses the affidavit to show that the specific language of this policy covers abatement costs for the CCCI site, despite the fact

that the contamination by plaintiff occurred after the policy expired.

Underwriters' motion has three aspects. First, Underwriters argues that the affidavit is defective because it was not made from Birsic's personal knowledge. Apparently, Birsic does not allege that his affidavit is based upon his personal knowledge. Moreover, defendant insists that Crucible has not demonstrated how Birsic is competent to testify about a policy issued thirty years ago. Second, Underwriters maintains that the affidavit is inadmissible to show the terms and conditions of an insurance policy. It claims that the terms and conditions of the policy can only be established by putting the policy into evidence. Finally, defendant contends that Crucible failed to authenticate Exhibit B of the affidavit, because the document does not contain any reference to the policy or a policy number.

In response, plaintiff disputes all three components of Underwriters' motion. First, Crucible alleges that the affidavit does not require Birsic's personal knowledge because it serves as a road map to documentary evidence. Specifically, it claims that the affidavit simply states that a true and correct copy of the policy is attached as Exhibit B. Next, plaintiff maintains that Crucible does not use the affidavit to establish the policy's terms and conditions. Instead, the affidavit referenced Exhibit B to establish that material facts exist concerning the terms of coverage. Finally, Crucible argues that the affidavit is authentic, because Exhibit B was taken from the larger exhibit, marked as "Webb 19" and "Williams 30."

The Instant motion is directed at plaintiff's attempt to derive liability coverage for the environmental clean-up at its CCCI site. Since the court has already dismissed these claims for reasons unrelated to the interpretation of the policy in question, Underwriters' motion in now moot. Therefore, the motion to strike paragraph 3 of the Birsic Affidavit is denied.

## V. *Underwriter's Motion for Summary Judgment: 1957 Excess Policies*

Underwriters also moves for summary judgment claiming that Crucible is unable to establish the existence of an excess liability insurance policy allegedly issued in 1957. Specifically, Underwriters contends that there is no primary or secondary evidence that it ever issued an excess policy to Crucible in 1957. Furthermore, it insists that neither the Lloyds of London insurance group, its agents, Crucible's brokers nor Crucible itself have any record of an excess policy being negotiated or contracted for in 1957. Notably, Crucible's name is missing from Underwriter's, lists of excess policies issued in 1957. In fact, the only evidence concerning a potential contract are some policy quotes to Crucible for excess liability coverage. However, these quotes are un-executed and do not establish the existence of a policy. Finally, Underwriters argues that this is not a missing policy situation as the proof shows that the alleged policy was never issued.

A detailed discussion of Underwriter's motion is unnecessary at this juncture because plaintiff has not opposed summary judgment. For this reason, Underwriter's motion for summary judgment can be granted without opinion. Moreover, dismissal is warranted in this case as the evidence currently before the court suggests that Underwriters never issued an excess policy to Crucible in 1957. Therefore, Underwriter's motion is granted and this aspect of plaintiff's claims is dismissed.

## VI. *Crucible's Motion for Summary Judgment*

In this action, Crucible seeks a declaratory judgment stating that Travelers must

defend and indemnify it for the environmental abatement of several of its properties. Unfortunately, plaintiff is unable to locate all of the insurance policies at issue due mainly to the passage of time. For this reason, Crucible now seeks summary judgment to settle the existence and material terms of the Travelers Policies. This motion is now moot because all issues regarding the Travelers Policies have been dismissed. Therefore, plaintiff's motion for summary judgment is denied in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED,** that Travelers' motion for summary judgment is **GRANTED.** It is further

**ORDERED,** that all claims regarding the Syracuse, N.Y., site are DISMISSED without prejudice through agreement of the parties. It is further

**ORDERED,** that Underwriter's motion for summary judgment is DENIED with regard to plaintiff's Trent Tube site and Pierce Oil site claims. It is **GRANTED** with regard to the CCCI site and this claim against Underwriters is hereby **DISMISSED.** It is further

**ORDERED,** that the parties shall submit the additional briefing requested by this court. The memoranda shall be filed with the Clerk of the Court by 5:00 p.m. on July 20, 2001. Oral argument shall be conducted on September 14, 2001, at 10:00 a.m., in Syracuse, N.Y., *if necessary.* It is further

**ORDERED,** that Underwriters motion to strike is **DENIED** as moot. It is further

**ORDERED,** that plaintiff's for motion summary judgment is **DENIED** as moot. It is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties by regular mail.